[L.A. No. 31063. Mar. 20, 1980.]

JUDITH SINDELL, Plaintiff and Appellant, v.
ABBOTT LABORATORIES et al.,
Defendants and Respondents.

MAUREEN ROGERS, Plaintiff and Appellant, v.
REXALL DRUG COMPANY et al.,
Defendants and Respondents.

592

**COUNSEL**

Donnenfeld & Brent, Jason G. Brent, Laurence M. Marks, Heily, Blase, Ellison & Wellcome and Jay H. Sorensen for Plaintiffs and Appellants.

Wylie Aitken, Stephen Zetterberg, Robert E. Cartwright, Harry DeLizonna, Edward I. Pollack, J. Nick DeMeo, Sanford M. Gage, Leonard Sacks, David Rosenberg, Jeanne Baker, David J. Fine and Rosenberg, Baker & Fine as Amici Curiae on behalf of Plaintiffs and Appellants.

Morgan, Wenzel & McNicholas, Darryl L. Dmytriw, Lord, Bissel & Brook, Hugh L. Moore, Crosby, Heafey, Roach & May, Richard J. Heafey, Peter W. Davis, John E. Carne, Leonard M. Friedman, John G. Fleming, George Fletcher, Adams, Duque & Hazeltine, Richard C. Field, David L. Bacon, Haight, Dickson, Brown & Bonesteel, Robert L. Dickson, Roy G. Weatherup, Hall R. Marston and Jerry M. Custis for Defendants and Respondents.

## Opinion

**MOSK, J.**—This case involves a complex problem both timely and significant: may a plaintiff, injured as the result of a drug administered to her mother during pregnancy, who knows the type of drug involved but cannot identify the manufacturer of the precise product, hold liable for her injuries a maker of a drug produced from an identical formula?

Plaintiff Judith Sindell brought an action against eleven drug companies and Does 1 through 100, on behalf of herself and other women similarly situated. The complaint alleges as follows:

Between 1941 and 1971, defendants were engaged in the business of manufacturing, promoting, and marketing diethylstilbesterol (DES), a drug which is a synthetic compound of the female hormone estrogen. The drug was administered to plaintiff's mother and the mothers of the class she represents,[1] for the purpose of preventing miscarriage. In 1947, the Food and Drug Administration authorized the marketing of DES as a miscarriage preventative, but only on an experimental basis, with a requirement that the drug contain a warning label to that effect.

---

[1]The plaintiff class alleged consists of "girls and women who are residents of California and who have been exposed to DES before birth and who may or may not know that fact or the dangers" to which they were exposed. Defendants are also sued as representatives of a class of drug manufacturers which sold DES after 1941.

DES may cause cancerous vaginal and cervical growths in the daughters exposed to it before birth, because their mothers took the drug during pregnancy. The form of cancer from which these daughters suffer is known as adenocarcinoma, and it manifests itself after a minimum latent period of 10 or 12 years. It is a fast-spreading and deadly disease, and radical surgery is required to prevent it from spreading. DES also causes adenosis, precancerous vaginal and cervical growths which may spread to other areas of the body. The treatment for adenosis is cauterization, surgery, or cryosurgery. Women who suffer from this condition must be monitored by biopsy or colposcopic examination twice a year, a painful and expensive procedure. Thousands of women whose mothers received DES during pregnancy are unaware of the effects of the drug.

In 1971, the Food and Drug Administration ordered defendants to cease marketing and promoting DES for the purpose of preventing miscarriages, and to warn physicians and the public that the drug should not be used by pregnant women because of the danger to their unborn children.

During the period defendants marketed DES, they knew or should have known that it was a carcinogenic substance, that there was a grave danger after varying periods of latency it would cause cancerous and precancerous growths in the daughters of the mothers who took it, and that it was ineffective to prevent miscarriage. Nevertheless, defendants continued to advertise and market the drug as a miscarriage preventative. They failed to test DES for efficacy and safety; the tests performed by others, upon which they relied, indicated that it was not safe or effective. In violation of the authorization of the Food and Drug Administration, defendants marketed DES on an unlimited basis rather than as an experimental drug, and they failed to warn of its potential danger.[2]

Because of defendants' advertised assurances that DES was safe and effective to prevent miscarriage, plaintiff was exposed to the drug prior to her birth. She became aware of the danger from such exposure within one year of the time she filed her complaint. As a result of the DES ingested by her mother, plaintiff developed a malignant bladder

---

[2]It is alleged also that defendants failed to determine if there was any means to avoid or treat the effects of DES upon the daughters of women exposed to it during pregnancy, and failed to monitor the carcinogenic effects of the drug.

tumor which was removed by surgery. She suffers from adenosis and must constantly be monitored by biopsy or colposcopy to insure early warning of further malignancy.

The first cause of action alleges that defendants were jointly and individually negligent in that they manufactured, marketed and promoted DES as a safe and efficacious drug to prevent miscarriage, without adequate testing or warning, and without monitoring or reporting its effects.

A separate cause of action alleges that defendants are jointly liable regardless of which particular brand of DES was ingested by plaintiff's mother because defendants collaborated in marketing, promoting and testing the drug, relied upon each other's tests, and adhered to an industry-wide safety standard. DES was produced from a common and mutually agreed upon formula as a fungible drug interchangeable with other brands of the same product; defendants knew or should have known that it was customary for doctors to prescribe the drug by its generic rather than its brand name and that pharmacists filled prescriptions from whatever brand of the drug happened to be in stock.

Other causes of action are based upon theories of strict liability, violation of express and implied warranties, false and fraudulent representations, misbranding of drugs in violation of federal law, conspiracy and "lack of consent."

Each cause of action alleges that defendants are jointly liable because they acted in concert, on the basis of express and implied agreements, and in reliance upon and ratification and exploitation of each other's testing and marketing methods.

Plaintiff seeks compensatory damages of $1 million and punitive damages of $10 million for herself. For the members of her class, she prays for equitable relief in the form of an order that defendants warn physicians and others of the danger of DES and the necessity of performing certain tests to determine the presence of disease caused by the drug, and that they establish free clinics in California to perform such tests.

Defendants demurred to the complaint. While the complaint did not expressly allege that plaintiff could not identify the manufacturer of the precise drug ingested by her mother, she stated in her points and au-

thorities in opposition to the demurrers filed by some of the defendants that she was unable to make the identification, and the trial court sustained the demurrers of these defendants without leave to amend on the ground that plaintiff did not and stated she could not identify which defendant had manufactured the drug responsible for her injuries. Thereupon, the court dismissed the action.[3] This appeal involves only five of ten defendants named in the complaint.[4]

Plaintiff Maureen Rogers filed a complaint containing allegations generally similar to those made by Sindell. She seeks compensatory and punitive damages on her own behalf, and on behalf of a class described in substantially the same terms as in Sindell's complaint, as well as equitable relief comparable to that sought by Sindell. The trial court sustained demurrers of E.R. Squibb & Sons, the Upjohn Company, and Rexall Drug Company.[5] Subsequent to the dismissal of her action

---

[3]There are minor variations in the procedures employed as to the various defendants. Thus, for example, Eli Lilly and Company filed a motion for summary judgment, or alternatively judgment on the pleadings, rather than a demurrer; the court treated the motion as a demurrer.

The demurrer of Abbott Laboratories, the first defendant to file a demurrer and the first to secure a dismissal, was sustained with leave to amend on the ground that plaintiff had failed to allege that a product manufactured by Abbott had caused her injuries (as opposed to the reason given by the trial court for sustaining the demurrers of the other defendants that plaintiff expressly stated that she could not identify a particular manufacturer). Upon plaintiff's failure to amend the complaint, the action was dismissed as to Abbott. A few days after the dismissal, plaintiff stated in a brief in opposition to the demurrers filed by defendants other than Abbott that she could not make the identification.

Abbott asserts that as to it the issue we consider on the appeal is not properly raised because plaintiff's statement that she could not identify the manufacturer was not made until after the action had been dismissed as to Abbott. This contention is without merit. Plaintiff's failure to amend her complaint after Abbott's demurrer was sustained with leave to amend was based upon her inability to identify a specific manufacturer. Clearly, Abbott interpreted the complaint in this fashion, for it moved for dismissal on the ground that the complaint alleges that plaintiff "does not know the identity of the drug...ingested" by her mother. Thus, Abbott may not now claim that the complaint is insufficient to raise the issue involved in this appeal.

The trial court did not determine other issues raised by the complaint, such as whether the case was properly brought as a class action.

[4]Abbott Laboratories, Eli Lilly and Company, E.R. Squibb and Sons, the Upjohn Company, and Rexall Drug Company are respondents. The action was dismissed or the appeal abandoned on various grounds as to other defendants named in the complaint; e.g., one defendant demonstrated it had not manufactured DES during the period plaintiff's mother took the drug.

[5]While the trial court did not specify the ground upon which the demurrers were sustained, the points and authorities filed by the parties emphasized the failure of Rogers to identify a particular manufacturer as the source of her injuries, and we may assume for the purpose of this appeal that this was the basis of the court's order.

against these defendants, Rogers amended the complaint to allege that Eli Lilly and Company, one of the defendants named in her complaint, had manufactured the drug used by her mother. Although Sindell's action and the present case have been consolidated on appeal, much of the discussion which follows will apply to Rogers only if she does not succeed in establishing that Eli Lilly and Company manufactured the DES taken by her mother. "Plaintiff" as used in this opinion refers to Sindell, and we discuss only the allegations of Sindell's complaint.

This case is but one of a number filed throughout the country seeking to hold drug manufacturers liable for injuries allegedly resulting from DES prescribed to the plaintiffs' mothers since 1947.[6] According to a note in the Fordham Law Review, estimates of the number of women who took the drug during pregnancy range from 1½ million to 3 million. Hundreds, perhaps thousands, of the daughters of these women suffer from adenocarcinoma, and the incidence of vaginal adenosis among them is 30 to 90 percent. (Comment, *DES and a Proposed Theory of Enterprise Liability* (1978) 46 Fordham L.Rev. 963, 964-967 [hereafter Fordham Comment].) Most of the cases are still pending. With two exceptions,[7] those that have been decided resulted in judgments in favor of the drug company defendants because of the failure of the plaintiffs to identify the manufacturer of the DES prescribed to their mothers.[8] The same result was reached in a recent California case. (*McCreery* v. *Eli Lilly & Co.* (1978) 87 Cal.App.3d 77, 82-84 [150 Cal.Rptr. 730].) The present action is another attempt to overcome this obstacle to recovery.

■ We begin with the proposition that, as a general rule, the imposition of liability depends upon a showing by the plaintiff that his or her injuries were caused by the act of the defendant or by an instrumentality under the defendant's control. The rule applies whether the injury

---

[6]DES was marketed under many different trade names.

[7]In a recent New York case a jury found in the plaintiff's favor in spite of her inability to identify a specific manufacturer of DES. An appeal is pending. (*Bichler* v. *Eli Lilly and Co.* (Sup.Ct.N.Y. 1979).) A Michigan appellate court recently held that plaintiffs had stated a cause of action against several manufacturers of DES even though identification could not be made. (*Abel* v. *Eli Lilly and Co.* (decided Dec. 5, 1979) Dock. No. 60497.) That decision is on appeal to the Supreme Court of Michigan.

[8]E.g., *Gray* v. *United States* (S.D.Tex. 1978) 445 F.Supp. 337. In their briefs, defendants refer to a number of other cases in which trial courts have dismissed actions in DES cases on the ground stated above.

resulted from an accidental event (e.g., *Shunk* v. *Bosworth* (6th Cir. 1964) 334 F.2d 309) or from the use of a defective product. (E.g., *Wetzel* v. *Eaton Corporation* (D.Minn. 1973) 62 F.R.D. 22, 29-30; *Garcia* v. *Joseph Vince Co.* (1978) 84 Cal.App.3d 868, 873-875 [148 Cal.Rptr. 843]; and see Annot. collection of cases in 51 A.L.R.3d 1344, 1351; 1 Hursh & Bailey, American Law of Products Liability (2d ed. 1974) p. 125.)

There are, however, exceptions to this rule. Plaintiff's complaint suggests several bases upon which defendants may be held liable for her injuries even though she cannot demonstrate the name of the manufacturer which produced the DES actually taken by her mother. The first of these theories, classically illustrated by *Summers* v. *Tice* (1948) 33 Cal.2d 80 [199 P.2d 1, 5 A.L.R.2d 91], places the burden of proof of causation upon tortious defendants in certain circumstances. The second basis of liability emerging from the complaint is that defendants acted in concert to cause injury to plaintiff. ■ There is a third and novel approach to the problem, sometimes called the theory of "enterprise liability," but which we prefer to designate by the more accurate term of "industry-wide" liability,[9] which might obviate the necessity for identifying the manufacturer of the injury-causing drug. We shall conclude that these doctrines, as previously interpreted, may not be applied to hold defendants liable under the allegations of this complaint. However, we shall propose and adopt a fourth basis for permitting the action to be tried, grounded upon an extension of the *Summers* doctrine.

I

Plaintiff places primary reliance upon cases which hold that if a party cannot identify which of two or more defendants caused an injury, the burden of proof may shift to the defendants to show that they were not responsible for the harm. This principle is sometimes referred to as the "alternative liability" theory.

The celebrated case of *Summers* v. *Tice, supra,* 33 Cal.2d 80, a unanimous opinion of this court, best exemplifies the rule. In *Summers,* the plaintiff was injured when two hunters negligently shot in his direction. It could not be determined which of them had fired the shot that

---

[9]The term "enterprise liability" is sometimes used broadly to mean that losses caused by an enterprise should be borne by it. (Klemme, *Enterprise Liability Theory of Torts* (1976) 47 Colo. L.Rev. 153, 158.)

actually caused the injury to the plaintiff's eye, but both defendants were nevertheless held jointly and severally liable for the whole of the damages. We reasoned that both were wrongdoers, both were negligent toward the plaintiff, and that it would be unfair to require plaintiff to isolate the defendant responsible, because if the one pointed out were to escape liability, the other might also, and the plaintiff-victim would be shorn of any remedy. In these circumstances, we held, the burden of proof shifted to the defendants, "each to absolve himself if he can." (*Id.*, p. 86.) We stated that under these or similar circumstances a defendant is ordinarily in a "far better position" to offer evidence to determine whether he or another defendant caused the injury.

In *Summers*, we relied upon *Ybarra v. Spangard* (1944) 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258]. There, the plaintiff was injured while he was unconscious during the course of surgery. He sought damages against several doctors and a nurse who attended him while he was unconscious. We held that it would be unreasonable to require him to identify the particular defendant who had performed the alleged negligent act because he was unconscious at the time of the injury and the defendants exercised control over the instrumentalities which caused the harm. Therefore, under the doctrine of res ipsa loquitur, an inference of negligence arose that defendants were required to meet by explaining their conduct.[10]

The rule developed in *Summers* has been embodied in the Restatement of Torts. (Rest.2d Torts, § 433B, subd. (3).)[11] Indeed, the *Summers* facts are used as an illustration (p. 447).

---

[10]Other cases cited by plaintiff for the proposition stated in *Summers* are only peripherally relevant. For example, in *Ray v. Alad Corp.* (1977) 19 Cal.3d 22 [136 Cal.Rptr. 574, 560 P.2d 3], the plaintiff brought an action in strict liability for personal injuries sustained when he fell from a defective ladder manufactured by the defendant's predecessor corporation. We held that, although under the general rule governing corporate succession the defendant could not be held responsible, nevertheless a "special departure" from that rule was justified in the particular circumstances. The defendant had succeeded to the good will of the manufacturer of the ladder, and it could obtain insurance against the risk of liability, whereas the plaintiff would be left without redress if he could not hold the defendant liable. The question whether one corporation should, for policy reasons, be answerable for the products manufactured by its predecessor is a different issue than that we describe above.

[11]Section 433B, subdivision (3) of the Restatement provides: "Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm." The reason underlying the rule is "the injustice of permitting proved wrongdoers, who among them

Defendants assert that these principles are inapplicable here. First, they insist that a predicate to shifting the burden of proof under *Summers-Ybarra* is that the defendants must have greater access to information regarding the cause of the injuries than the plaintiff, whereas in the present case the reverse appears.

■ Plaintiff does not claim that defendants are in a better position than she to identify the manufacturer of the drug taken by her mother or, indeed, that they have the ability to do so at all, but argues, rather, that *Summers* does not impose such a requirement as a condition to the shifting of the burden of proof. In this respect we believe plaintiff is correct.

In *Summers*, the circumstances of the accident themselves precluded an explanation of its cause. To be sure, *Summers* states that defendants are "[o]rdinarily...in a far better position to offer evidence to determine which one caused the injury" than a plaintiff (33 Cal.2d 80, at p. 86), but the decision does not determine that this "ordinary" situation was present. Neither the facts nor the language of the opinion indicate that the two defendants, simultaneously shooting in the same direction, were in a better position than the plaintiff to ascertain whose shot caused the injury. As the opinion acknowledges, it was impossible for the trial court to determine whether the shot which entered the plaintiff's eye came from the gun of one defendant or the other. Nevertheless, burden of proof was shifted to the defendants.

Here, as in *Summers*, the circumstances of the injury appear to render identification of the manufacturer of the drug ingested by plaintiff's mother impossible by either plaintiff or defendants, and it cannot reasonably be said that one is in a better position than the other to make the identification. Because many years elapsed between the time the drug was taken and the manifestation of plaintiff's injuries she, and many other daughters of mothers who took DES, are unable to make such identification.[12] Certainly there can be no implication that plaintiff

---

have inflicted an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm." (Rest.2d Torts, § 433B, com. f, p. 446.)

[12]The trial court was not required to determine whether plaintiff had made sufficient efforts to establish identification since it concluded that her failure to do so was fatal to her claim. The court accepted at face value plaintiff's assertion that she could not make the identification, and for purposes of this appeal we make the same assumption.

is at fault in failing to do so—the event occurred while plaintiff was *in utero*, a generation ago.[13]

On the other hand, it cannot be said with assurance that defendants have the means to make the identification. In this connection, they point out that drug manufacturers ordinarily have no direct contact with the patients who take a drug prescribed by their doctors. Defendants sell to wholesalers, who in turn supply the product to physicians and pharmacies. Manufacturers do not maintain records of the persons who take the drugs they produce, and the selection of the medication is made by the physician rather than the manufacturer. Nor do we conclude that the absence of evidence on this subject is due to the fault of defendants. While it is alleged that they produced a defective product with delayed effects and without adequate warnings, the difficulty or impossibility of identification results primarily from the passage of time rather than from their allegedly negligent acts of failing to provide adequate warnings. Thus *Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756 [91 Cal.Rptr. 745, 478 P.2d 465], upon which plaintiff relies, is distinguishable.[14]

It is important to observe, however, that while defendants do not have means superior to plaintiff to identify the maker of the precise drug

[13]Defendants maintain that plaintiff is in a better position than they are to identify the manufacturer because her mother might recall the name of the prescribing physician or the hospital or pharmacy where the drug originated, and might know the brand and strength of dosage, the appearance of the medication, or other details from which the manufacturer might be identified, whereas they possess none of this information. As we point out in footnote 12, we assume for purposes of this appeal that plaintiff cannot point to any particular manufacturer as the producer of the DES taken by her mother.

[14]In *Haft*, a father and his young son drowned in defendants' swimming pool. There were no witnesses to the accident. Defendants were negligent in failing to provide a lifeguard, as required by law. We held that the absence of evidence of causation was a direct and foreseeable result of the defendants' negligence, and that, therefore, the burden of proof on the issue of causation was upon defendants. Plaintiff attempts to bring herself within this holding. She asserts that defendants' failure to discover or warn of the dangers of DES and to label the drug as experimental caused her mother to fail to keep records or remember the brand name of the drug prescribed to her "since she was unaware of any reason to do so for a period of 10 to 20 years." There is no proper analogy to *Haft* here. While in *Haft* the presence of a lifeguard on the scene would have provided a witness to the accident and probably prevented it, plaintiff asks us to speculate that if the DES taken by her mother had been labelled as an experimental drug, she would have recalled or recorded the name of the manufacturer and passed this information on to her daughter. It cannot be said here that the absence of evidence of causation was a "direct and forseeable result" of defendants' failure to provide a warning label.

taken by her mother, they may in some instances be able to prove that they did not manufacture the injury-causing substance. In the present case, for example, one of the original defendants was dismissed from the action upon proof that it did not manufacture DES until after plaintiff was born.

Thus we conclude the fact defendants do not have greater access to information that might establish the identity of the manufacturer of the DES which injured plaintiff does not per se prevent application of the *Summers* rule.

■ Nevertheless, plaintiff may not prevail in her claim that the *Summers* rationale should be employed to fix the whole liability for her injuries upon defendants, at least as those principles have previously been applied.[15] There is an important difference between the situation involved in *Summers* and the present case. There, all the parties who were or could have been responsible for the harm to the plaintiff were joined as defendants. Here, by contrast, there are approximately 200 drug companies which made DES, any of which might have manufactured the injury-producing drug.[16]

Defendants maintain that, while in *Summers* there was a 50 percent chance that one of the two defendants was responsible for the plaintiff's injuries, here since any one of 200 companies which manufactured DES

---

[15]Plaintiff relies upon three older cases for the proposition that the burden of proof may be shifted to defendants to explain the cause of an accident even if less than all of them are before the court. (*Benson* v. *Ross* (1906) 143 Mich. 452 [106 N.W. 1120]; *Moore* v. *Foster* (1938) 182 Miss. 15 [180 So. 73]; *Oliver* v. *Miles* (1927) 144 Miss. 852 [110 So. 666].) These cases do not relate to the shifting of the burden of proof; rather, they imposed liability upon one of two or more joint tortfeasors on the ground that they acted in concert in committing a negligent act. This theory of concerted action as a basis for defendants' liability will be discussed *infra*. In *Summers*, we stated that these cases were "straining" the concept of concerted action and that the "more reasonable" basis for holding defendants jointly liable when more than one of them had committed a tort and plaintiff could not establish the identity of the party who had caused the damage was the danger that otherwise two negligent parties might be exonerated. (*Summers*, 33 Cal.2d 80, at pp. 84-85.)

[16]According to the Restatement, the burden of proof shifts to the defendants only if the plaintiff can demonstrate that all defendants acted tortiously and that the harm resulted from the conduct of one of them. (Rest.2d Torts, § 433B, com. g, p. 446.) It goes on to state that the rule thus far has been applied only where all the actors involved are joined as defendants and where the conduct of all is simultaneous in time, but cases might arise in which some modification of the rule would be necessary if one of the actors is or cannot be joined, or because of the effects of lapse of time, or other circumstances. (*Id.*, com. h, p. 446.)

might have made the product that harmed plaintiff, there is no rational basis upon which to infer that any defendant in this action caused plaintiff's injuries, nor even a reasonable possibility that they were responsible.[17]

These arguments are persuasive if we measure the chance that any one of the defendants supplied the injury-causing drug by the number of possible tortfeasors. In such a context, the possibility that any of the five defendants supplied the DES to plaintiff's mother is so remote that it would be unfair to require each defendant to exonerate itself. There may be a substantial likelihood that none of the five defendants joined in the action made the DES which caused the injury, and that the offending producer not named would escape liability altogether. While we propose, *infra*, an adaptation of the rule in *Summers* which will substantially overcome these difficulties, defendants appear to be correct that the rule, as previously applied, cannot relieve plaintiff of the burden of proving the identity of the manufacturer which made the drug causing her injuries.[18]

## II

The second principle upon which plaintiff relies is the so-called "concert of action" theory. Preliminarily, we briefly describe the procedure a drug manufacturer must follow before placing a drug on the market. Under federal law as it read prior to 1962, a new drug was defined as one "not generally recognized as...safe." (§ 102, 76 Stat. 781 (Oct. 10, 1962).) Such a substance could be marketed only if a new drug applica-

---

[17]Defendants claim further that the effect of shifting the burden of proof to them to demonstrate that they did not manufacture the DES which caused the injury would create a rebuttable presumption that one of them made the drug taken by plaintiff's mother, and that this presumption would deny them due process because there is no rational basis for the inference.

[18]*Garcia v. Joseph Vince Co., supra*, 84 Cal.App.3d 868, relied upon by defendants, presents a distinguishable factual situation. The plaintiff in *Garcia* was injured by a defective saber. He was unable to identify which of two manufacturers had produced the weapon because it was commingled with other sabers after the accident. In a suit against both manufacturers, the court refused to apply the *Summers* rationale on the ground that the plaintiff had not shown that either defendant had violated a duty to him. Thus in *Garcia*, only one of the two defendants was alleged to have manufactured a defective product, and the plaintiff's inability to identify which of the two was negligent resulted in a judgment for both defendants. (See also *Wetzel v. Eaton Corporation, supra*, 62 F.R.D. 22.) Here, by contrast, the DES manufactured by all defendants is alleged to be defective, but plaintiff is unable to demonstrate which of the defendants supplied the precise DES which caused her injuries.

tion had been filed with the Food and Drug Administration and had become "effective."[19] If the agency determined that a product was no longer a "new drug," i.e., that it was "generally recognized as...safe," (21 U.S.C.A. § 321(p)(1) it could be manufactured by any drug company without submitting an application to the agency. According to defendants, 123 new drug applications for DES had been approved by 1952, and in that year DES was declared not to be a "new drug," thus allowing any manufacturer to produce it without prior testing and without submitting a new drug application to the Food and Drug Administration.

■■ With this background we consider whether the complaint states a claim based upon "concert of action" among defendants. ■■ The elements of this doctrine are prescribed in section 876 of the Restatement Second of Torts. The section provides, "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." With respect to this doctrine, Prosser states that "those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him. [¶] Express agreement is not necessary, and all that is required is that there be a tacit understanding...." (Prosser, Law of Torts (4th ed. 1971) § 46, p. 292.)

■■ Plaintiff contends that her complaint states a cause of action under these principles. She alleges that defendants' wrongful conduct "is the result of planned and concerted action, express and implied agreements, collaboration in, reliance upon, acquiescence in and ratification, exploitation and adoption of each other's testing, marketing

---

[19] A new drug application became "effective" automatically if the Secretary of Health, Education and Welfare failed within a certain period of time to disapprove the application. If the agency had insufficient information to decide whether the drug was safe or had information that it was unsafe, the application was denied. (§ 505, 52 Stat. 1052 (June 25, 1938).) Since 1962, affirmative approval of an application has been required before a new drug may be marketed. (21 U.S.C.A. § 355(c).)

methods, lack of warnings…and other acts or omissions…" and that "acting individually and in concert, [defendants] promoted, approved, authorized, acquiesced in, and reaped profits from sales" of DES. These allegations, plaintiff claims, state a "tacit understanding" among defendants to commit a tortious act against her.

In our view, this litany of charges is insufficient to allege a cause of action under the rules stated above. The gravamen of the charge of concert is that defendants failed to adequately test the drug or to give sufficient warning of its dangers and that they relied upon the tests performed by one another and took advantage of each others' promotional and marketing techniques. These allegations do not amount to a charge that there was a tacit understanding or a common plan among defendants to fail to conduct adequate tests or give sufficient warnings, and that they substantially aided and encouraged one another in these omissions.

The complaint charges also that defendants produced DES from a "common and mutually agreed upon formula," allowing pharmacists to treat the drug as a "fungible commodity" and to fill prescriptions from whatever brand of DES they had on hand at the time. It is difficult to understand how these allegations can form the basis of a cause of action for wrongful conduct by defendants, acting in concert. The formula for DES is a scientific constant. It is set forth in the United States Pharmacopoeia, and any manufacturer producing that drug must, with exceptions not relevant here, utilize the formula set forth in that compendium. (21 U.S.C.A. § 351(b).)

What the complaint appears to charge is defendants' parallel or imitative conduct in that they relied upon each others' testing and promotion methods. But such conduct describes a common practice in industry: a producer avails himself of the experience and methods of others making the same or similar products. Application of the concept of concert of action to this situation would expand the doctrine far beyond its intended scope and would render virtually any manufacturer liable for the defective products of an entire industry, even if it could be demonstrated that the product which caused the injury was not made by the defendant.

None of the cases cited by plaintiff supports a conclusion that defendants may be held liable for concerted tortious acts. They involve

conduct by a small number of individuals whose actions resulted in a tort against a single plaintiff, usually over a short span of time, and the defendant held liable was either a direct participant in the acts which caused damage,[20] or encouraged and assisted the person who directly caused the injuries by participating in a joint activity.[21]

*Orser* v. *George* (1967) 252 Cal.App.2d 660 [60 Cal.Rptr. 708], upon which plaintiff primarily relies, is also distinguishable. There, three hunters negligently shot at a mudhen in decedent's direction. Two of them shot alternately with the gun which released the bullet resulting in the fatal wound, and the third, using a different gun, fired alternately at the same target, shooting in the same line of fire, perhaps acting tortiously. It was held that there was a possibility the third hunter knew the conduct of the others was tortious toward the decedent and gave them substantial assistance and encouragement, and that it was also possible his conduct, separately considered, was a breach of duty toward decedent. Thus, the granting of summary judgment was reversed as to the third hunter.

The situation in *Orser* is similar to *Agovino* v. *Kunze, supra*, 181 Cal. App.2d 591, in which liability was imposed upon a participant in a drag race, rather than to the facts alleged in the present case. There is no allegation here that each defendant knew the other defendants' conduct was tortious toward plaintiff, and that they assisted and encouraged one another to inadequately test DES and to provide inadequate warnings. Indeed, it seems dubious whether liability on the concert of action theory can be predicated upon substantial assistance and encouragement given by one alleged tortfeasor to another pursuant to a tacit understanding to fail to perform an act. Thus, there was no concert of action among defendants within the meaning of that doctrine.

---

[20]*Weinberg Co.* v. *Bixby* (1921) 185 Cal. 87, 103 [196 P. 25], involved a husband who was held liable with his wife for wrongful diversion of flood waters although he had given his wife title to the land upon which the outlet causing the diversion was constructed. He not only owned land affected by the flood waters, but he was his wife's agent for the purpose of reopening the outlet which caused the damage. In *Meyer* v. *Thomas* (1936) 18 Cal.App.2d 299, 305-306 [63 P.2d 1176], both defendants participated in the conversion of a note and deed of trust.

[21]In *Agovino* v. *Kunze* (1960) 181 Cal.App.2d 591, 599 [5 Cal.Rptr. 534], a participant in a drag race was held liable for injuries to a plaintiff who collided with the car of another racer. In *Loeb* v. *Kimmerle* (1932) 215 Cal. 143, 151 [9 P.2d 199], a defendant who encouraged another defendant to commit an assault was held jointly liable for the plaintiff's injuries. Also see *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40 [123 Cal.Rptr. 468, 539 P.2d 36].

## III

A third theory upon which plaintiff relies is the concept of industry-wide liability, or according to the terminology of the parties, "enterprise liability." This theory was suggested in *Hall* v. *E. I. Du Pont de Nemours & Co., Inc.* (E.D.N.Y. 1972) 345 F.Supp. 353. In that case, plaintiffs were 13 children injured by the explosion of blasting caps in 12 separate incidents which occurred in 10 different states between 1955 and 1959. The defendants were six blasting cap manufacturers, comprising virtually the entire blasting cap industry in the United States, and their trade association. There were, however, a number of Canadian blasting cap manufacturers which could have supplied the caps. The gravamen of the complaint was that the practice of the industry of omitting a warning on individual blasting caps and of failing to take other safety measures created an unreasonable risk of harm, resulting in the plaintiffs' injuries. The complaint did not identify a particular manufacturer of a cap which caused a particular injury.[22]

The court reasoned as follows: there was evidence that defendants, acting independently, had adhered to an industry-wide standard with regard to the safety features of blasting caps, that they had in effect delegated some functions of safety investigation and design, such as labelling, to their trade association, and that there was industry-wide cooperation in the manufacture and design of blasting caps. In these circumstances, the evidence supported a conclusion that all the defen-

---

[22]We deliberately employ the term "suggested" to describe the effect of the *Hall* opinion because of the uncertain posture of the decision as authority. The defendants moved to dismiss the action on the ground that the plaintiffs had not stated a claim, and they also sought to sever the claims of the various plaintiffs and transfer them to the district court in the place where each accident occurred. The opinion discusses various possible bases of liability, including industry-wide liability, upon the assumption that there existed a national body of state tort law. (345 F.Supp. at p. 360.) At the conclusion of its opinion, the court called for briefs on the choice-of-law issues involved in the case. In a subsequent opinion, the same court decided, after briefs had been filed on the choice-of-law question, that the plaintiffs' claims should be severed, and it transferred each one to the federal court sitting in the district where the accident occurred. (*Chance* v. *E. I. Du Pont de Nemours & Co., Inc.* (E.D.N.Y 1974) 371 F.Supp. 439.) Thereafter, the transferred cases resulted in judgments for defendants upon various grounds unrelated to the theory of industry-wide liability. (*Lehtonen* v. *E. I. Du Pont de Nemours & Co., Inc.* (D.Mont. 1975) 389 F.Supp. 633 [failure to amend complaint within 30 days]; *Davis* v. *E. I. Du Pont de Nemours & Co., Inc.* (W.D.N.C. 1974) 400 F.Supp. 1347 [statute of limitations]; *Ball* v. *E. I. Du Pont de Nemours & Co., Inc.* (6th Cir. 1975) 519 F.2d 715 [jury verdict in favor of defendant after plaintiff identified the manufacturer of the blasting cap which caused his injuries].) The parties have not indicated the status of the remaining cases transferred.

dants jointly controlled the risk. Thus, if plaintiffs could establish by a preponderance of the evidence that the caps were manufactured by one of the defendants, the burden of proof as to causation would shift to all the defendants. The court noted that this theory of liability applied to industries composed of a small number of units, and that what would be fair and reasonable with regard to an industry of five or ten producers might be manifestly unreasonable if applied to a decentralized industry composed of countless small producers.[23]

■ Plaintiff attempts to state a cause of action under the rationale of *Hall*. She alleges joint enterprise and collaboration among defendants in the production, marketing, promotion and testing of DES, and "concerted promulgation and adherence to industry-wide testing, safety, warning and efficacy standards" for the drug. We have concluded above that allegations that defendants relied upon one another's testing and promotion methods do not state a cause of action for concerted conduct to commit a tortious act. Under the theory of industry-wide liability, however, each manufacturer could be liable for all injuries caused by DES by virtue of adherence to an industry-wide standard of safety.

In the Fordham Comment, the industry-wide theory of liability is discussed and refined in the context of its applicability to actions alleging injuries resulting from DES. The author explains causation under that theory as follows, "...[T]he industrywide standard becomes itself the cause of plaintiff's injury, just as defendants' joint plan is the cause of injury in the traditional concert of action plea. Each defendant's adherence perpetuates this standard, which results in the manufacture of the particular, unidentifiable injury-producing product. Therefore, each industry member has contributed to plaintiff's injury." (Fordham Comment, *supra*, at p. 997.)

The comment proposes seven requirements for a cause of action based upon industry-wide liability,[24] and suggests that if a plaintiff

---

[23]In discussing strict liability, the *Hall* court mentioned the drug industry, stating, "In cases where manufacturers have more experience, more information, and more control over the risky properties of their products than do drug manufacturers, courts have applied a broader concept of forseeability which approaches the enterprise liability rationale." (345 F.Supp. 353 at p. 370.)

[24]The suggested requirements are as follows:

1. There existed an insufficient, industry-wide standard of safety as to the manufacture of the product.

2. Plaintiff is not at fault for the absence of evidence identifying the causative agent but, rather, this absence of proof is due to defendant's conduct.

proves these elements, the burden of proof of causation should be shifted to the defendants, who may exonerate themselves only by showing that their product could not have caused the injury.[25]

We decline to apply this theory in the present case. At least 200 manufacturers produced DES; *Hall*, which involved 6 manufacturers representing the entire blasting cap industry in the United States, cautioned against application of the doctrine espoused therein to a large number of producers. (345 F.Supp. at p. 378.) Moreover, in *Hall*, the conclusion that the defendants jointly controlled the risk was based upon allegations that they had delegated some functions relating to safety to a trade association. There are no such allegations here, and we have concluded above that plaintiff has failed to allege liability on a concert of action theory.

Equally important, the drug industry is closely regulated by the Food and Drug Administration, which actively controls the testing and manufacture of drugs and the method by which they are marketed, including the contents of warning labels.[26] To a considerable degree, therefore, the standards followed by drug manufacturers are suggested or compelled by the government. Adherence to those standards cannot, of course, absolve a manufacturer of liability to which it would otherwise be subject. (*Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 65 [107

---

3. A generically similar defective product was manufactured by all the defendants.
4. Plaintiff's injury was caused by this defect.
5. Defendants owed a duty to the class of which plaintiff was a member.
6. There is clear and convincing evidence that plaintiff's injury was caused by a product made by one of the defendants. For example, the joined defendants accounted for a high percentage of such defective products on the market at the time of plaintiff's injury.
7. All defendants were tortfeasors.

[25]The Fordham Comment takes exception to one aspect of the theory of industry-wide liability as set forth in *Hall*, i.e., the conclusion that a plaintiff is only required to show by a preponderance of the evidence that one of the defendants manufactured the product which caused her injury. The comment suggests that a plaintiff be required to prove by clear and convincing evidence that one of the defendants before the court was responsible and that this standard of proof would require that the plaintiff join in the action the producers of 75 or 80 percent of the DES prescribed for prevention of miscarriage. It is also suggested that the damages be apportioned among the defendants according to their share of the market for DES. (Fordham Comment, *supra*, at pp. 999-1000.)

[26]Federal regulations may specify the type of tests a manufacturer must perform for certain drugs (21 C.F.R. § 436.206 et seq.), the type of packaging used (§ 429.10), the warnings which appear on labels (§ 369.20), and the standards to be followed in the manufacture of a drug (§ 211.22 et seq.).

Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059].) But since the government plays such a pervasive role in formulating the criteria for the testing and marketing of drugs, it would be unfair to impose upon a manufacturer liability for injuries resulting from the use of a drug which it did not supply simply because it followed the standards of the industry.[27]

IV

■ If we were confined to the theories of *Summers* and *Hall*, we would be constrained to hold that the judgment must be sustained. Should we require that plaintiff identify the manufacturer which supplied the DES used by her mother or that all DES manufacturers be joined in the action, she would effectively be precluded from any recovery. As defendants candidly admit, there is little likelihood that all the manufacturers who made DES at the time in question are still in business or that they are subject to the jurisdiction of the California courts. There are, however, forceful arguments in favor of holding that plaintiff has a cause of action.

In our contemporary complex industrialized society, advances in science and technology create fungible goods which may harm consumers and which cannot be traced to any specific producer. The response of the courts can be either to adhere rigidly to prior doctrine, denying recovery to those injured by such products, or to fashion remedies to meet these changing needs. Just as Justice Traynor in his landmark concurring opinion in *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 467-468 [150 P.2d 436], recognized that in an era of mass production and complex marketing methods the traditional standard of negligence was insufficient to govern the obligations of manufacturer to consumer, so should we acknowledge that some adaptation of the rules of causation and liability may be appropriate in these recurring circumstances. The Restatement comments that modification of the *Summers* rule may be necessary in a situation like that before us. (See fn. 16, *ante*.)

The most persuasive reason for finding plaintiff states a cause of action is that advanced in *Summers*: as between an innocent plaintiff and

---

[27] *Abel* v. *Eli Lilly and Company*, the Michigan case referred to above which held that the plaintiffs had stated a cause of action against several manufacturers of DES even though they could not identify a particular manufacturer as the source of a particular injury (see fn. 7, *ante*), relied upon the theories of concerted action and alternative liability.

negligent defendants, the latter should bear the cost of the injury. Here, as in *Summers*, plaintiff is not at fault in failing to provide evidence of causation, and although the absence of such evidence is not attributable to the defendants either, their conduct in marketing a drug the effects of which are delayed for many years played a significant role in creating the unavailability of proof.

From a broader policy standpoint, defendants are better able to bear the cost of injury resulting from the manufacture of a defective product. As was said by Justice Traynor in *Escola*, "[t]he cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business." (24 Cal.2d p. 462; see also Rest.2d Torts, § 402A, com. c, pp. 349-350.) The manufacturer is in the best position to discover and guard against defects in its products and to warn of harmful effects; thus, holding it liable for defects and failure to warn of harmful effects will provide an incentive to product safety. (*Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 129 [104 Cal.Rptr. 433, 501 P.2d 1153]; *Beech Aircraft Corp.* v. *Superior Court* (1976) 61 Cal.App.3d 501, 522-523 [132 Cal.Rptr. 541].) These considerations are particularly significant where medication is involved, for the consumer is virtually helpless to protect himself from serious, sometimes permanent, sometimes fatal, injuries caused by deleterious drugs.

Where, as here, all defendants produced a drug from an identical formula and the manufacturer of the DES which caused plaintiff's injuries cannot be identified through no fault of plaintiff, a modification of the rule of *Summers* is warranted. As we have seen, an undiluted *Summers* rationale is inappropriate to shift the burden of proof of causation to defendants because if we measure the chance that any particular manufacturer supplied the injury-causing product by the number of producers of DES, there is a possibility that none of the five defendants in this case produced the offending substance and that the responsible manufacturer, not named in the action, will escape liability.

But we approach the issue of causation from a different perspective: we hold it to be reasonable in the present context to measure the likelihood that any of the defendants supplied the product which allegedly injured plaintiff by the percentage which the DES sold by each of them for the purpose of preventing miscarriage bears to the entire production

of the drug sold by all for that purpose. Plaintiff asserts in her briefs that Eli Lilly and Company and five or six other companies produced 90 percent of the DES marketed. If at trial this is established to be the fact, then there is a corresponding likelihood that this comparative handful of producers manufactured the DES which caused plaintiff's injuries, and only a 10 percent likelihood that the offending producer would escape liability.[28]

If plaintiff joins in the action the manufacturers of a substantial share of the DES which her mother might have taken, the injustice of shifting the burden of proof to defendants to demonstrate that they could not have made the substance which injured plaintiff is significantly diminished. While 75 to 80 percent of the market is suggested as the requirement by the Fordham Comment (at p. 996), we hold only that a substantial percentage is required.

The presence in the action of a substantial share of the appropriate market also provides a ready means to apportion damages among the defendants. Each defendant will be held liable for the proportion of the judgment represented by its share of that market unless it demonstrates that it could not have made the product which caused plaintiff's injuries. In the present case, as we have seen, one DES manufacturer was dismissed from the action upon filing a declaration that it had not manufactured DES until after plaintiff was born. Once plaintiff has met her burden of joining the required defendants, they in turn may cross-complain against other DES manufacturers, not joined in the action, which they can allege might have supplied the injury-causing product.

Under this approach, each manufacturer's liability would approximate its responsibility for the injuries caused by its own products. Some minor discrepancy in the correlation between market share and liability is inevitable; therefore, a defendant may be held liable for a somewhat different percentage of the damage than its share of the appropriate

---

[28]The Fordham Comment explains the connection between percentage of market share and liability as follows: "[I]f X Manufacturer sold one-fifth of all the DES prescribed for pregnancy and identification could be made in all cases, X would be the sole defendant in approximately one-fifth of all cases and liable for all the damages in those cases. Under alternative liability, X would be joined in all cases in which identification could not be made, but liable for only one-fifth of the total damages in these cases. X would pay the same amount either way. Although the correlation is not, in practice, perfect [footnote omitted], it is close enough so that defendants' objections on the ground of fairness lose their value." (Fordham Comment, *supra*, at p. 994.)

market would justify. It is probably impossible, with the passage of time, to determine market share with mathematical exactitude. But just as a jury cannot be expected to determine the precise relationship between fault and liability in applying the doctrine of comparative fault (*Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]) or partial indemnity (*American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899]), the difficulty of apportioning damages among the defendant producers in exact relation to their market share does not seriously militate against the rule we adopt. As we said in *Summers* with regard to the liability of independent tortfeasors, where a correct division of liability cannot be made "the trier of fact may make it the best it can." (33 Cal.2d at p. 88.)

We are not unmindful of the practical problems involved in defining the market and determining market share,[29] but these are largely matters of proof which properly cannot be determined at the pleading stage of these proceedings. Defendants urge that it would be both unfair and contrary to public policy to hold them liable for plaintiff's injuries in the absence of proof that one of them supplied the drug responsible for the damage. Most of their arguments, however, are based upon the assumption that one manufacturer would be held responsible for the products of another or for those of all other manufacturers if plaintiff ultimately prevails. But under the rule we adopt, each manufacturer's liability for an injury would be approximately equivalent to the damage caused by the DES it manufactured.[30]

The judgments are reversed.

Bird, C. J., Newman, J., and White, J.,* concurred.

---

[29]Defendants assert that there are no figures available to determine market share, that DES was provided for a number of uses other than to prevent miscarriage and it would be difficult to ascertain what proportion of the drug was used as a miscarriage preventative, and that the establishment of a time frame and area for market share would pose problems.

[30]The dissent concludes by implying the problem will disappear if the Legislature appropriates funds "for the education, identification, and screening of persons exposed to DES." While such a measure may arguably be helpful in the abstract, it does not address the issue involved here: damages for injuries which have been or will be suffered. Nor, as a principle, do we see any justification for shifting the financial burden for such damages from drug manufacturers to the taxpayers of California.

*Assigned by the Chairperson of the Judicial Council.

**RICHARDSON, J.**—I respectfully dissent. In these consolidated cases the majority adopts a wholly new theory which contains these ingredients: The plaintiffs were not alive at the time of the commission of the tortious acts. They sue a generation later. They are permitted to receive substantial damages from multiple defendants without any proof that any defendant caused or even probably caused plaintiffs' injuries.

Although the majority purports to change only the required burden of proof by shifting it from plaintiffs to defendants, the effect of its holding is to guarantee that plaintiffs will prevail on the causation issue because defendants are no more capable of disproving factual causation than plaintiffs are of proving it. "Market share" liability thus represents a new high water mark in tort law. The ramifications seem almost limitless, a fact which prompted one recent commentator, in criticizing a substantially identical theory, to conclude that "Elimination of the burden of proof as to identification [of the manufacturer whose drug injured plaintiff] would impose a liability which would exceed absolute liability." (Coggins, *Industry-Wide Liability* (1979) 13 Suffolk L.Rev. 980, 998, fn. omitted; see also, pp. 1000-1001.) In my view, the majority's departure from traditional tort doctrine is unwise.

The applicable principles of causation are very well established. A leading torts scholar, Dean Prosser, has authoritatively put it this way: "An *essential* element of the plaintiff's cause of action for negligence, *or for that matter for any other tort*, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." (Prosser, Torts (4th ed. 1971) § 41, p. 236, italics added.) With particular reference to the matter before us, and in the context of products liability, the requirement of a causation element has been recognized as equally fundamental. "It is clear that any holding that a producer, manufacturer, seller, or a person in a similar position, is liable for injury caused by a particular product, must necessarily be predicated upon proof that the product in question was one for whose condition the defendant was in some way responsible. Thus, for example, if recovery is sought from a manufacturer, *it must be shown that he actually was the manufacturer of the product which caused the injury;...*" (1 Hursh & Bailey, American Law of Products Liability (2d ed. 1974) § 1:41, p. 125, italics added; accord, *Prosser, supra*, § 103, at pp. 671-672; 2 Dooley, Modern Tort Law (1977) § 32.03, p. 243.) Indeed, an inability to prove this causal link between defendant's conduct and plaintiff's injury has proven fatal in prior cases

brought against manufacturers of DES by persons who were situated in positions identical to those of plaintiffs herein. (See *McCreery* v. *Eli Lilly & Co.* (1978) 87 Cal.App.3d 77, 82 [150 Cal.Rptr. 730]; *Gray* v. *United States* (S.D.Tex. 1978) 445 F.Supp. 337, 338.)

The majority now expressly abandons the foregoing traditional requirement of some causal connection between defendants' act and plaintiffs' injury in the creation of its new modified industry-wide tort. Conceptually, the doctrine of absolute liability which heretofore in negligence law has substituted only for the requirement of a breach of defendant's duty of care, under the majority's hand now subsumes the additional necessity of a causal relationship.

According to the majority, in the present case plaintiffs have openly conceded that they are unable to identify the particular entity which manufactured the drug consumed by their mothers. In fact, plaintiffs have joined only *five* of the approximately *two hundred* drug companies which manufactured DES. Thus, the case constitutes far more than a mere factual variant upon the theme composed in *Summers* v. *Tice* (1948) 33 Cal.2d 80 [199 P.2d 1], wherein plaintiff joined as codefendants the *only* two persons who could have injured him. As the majority must acknowledge, our *Summers* rule applies only to cases in which "...it is proved that harm has been caused to the plaintiff by...one of [the named defendants], but there is uncertainty as to which one has caused it,..." (Rest.2d Torts, § 433B, subd. (3).) In the present case, in stark contrast, it remains wholly speculative and conjectural whether *any* of the five named defendants actually caused plaintiffs' injuries.

The fact that plaintiffs cannot tie defendants to the injury-producing drug does not trouble the majority for it declares that the *Summers* requirement of proof of actual causation by a named defendant is satisfied by a joinder of those defendants who have *together* manufactured *"a substantial percentage"* of the DES which has been marketed. Notably lacking from the majority's expression of its new rule, unfortunately, is any definition or guidance as to what should constitute a "substantial" share of the relevant market. The issue is entirely open-ended and the answer, presumably, is anyone's guess.

Much more significant, however, is the consequence of this unprecedented extension of liability. Recovery is permitted from a handful of defendants *each* of whom *individually* may account for a comparatively

small share of the relevant market, so long as the *aggregate* business of those who have been sued is deemed "substantial." In other words, a particular defendant may be held proportionately liable *even though mathematically it is much more likely than not that it played no role whatever in causing plaintiffs' injuries.* Plaintiffs have strikingly capsulated their reasoning by insisting ". . . that while one manufacturer's product may not have injured a particular plaintiff, we can assume that it injured a different plaintiff and all we are talking about is a mere matching of plaintiffs and defendants." (Counsel's letter (Oct. 16, 1979) p. 3.) In adopting the foregoing rationale the majority rejects over 100 years of tort law which required that before tort liability was imposed a "matching" of defendant's conduct and plaintiff's injury was absolutely essential. Furthermore, in bestowing on plaintiffs this new largess the majority sprinkles the rain of liability upon all the joined defendants alike—those who may be tortfeasors and those who may have had nothing at all to do with plaintiffs' injury—and an added bonus is conferred. Plaintiffs are free to pick and choose their targets.

The "market share" thesis may be paraphrased. Plaintiffs have been hurt by *someone* who made DES. Because of the lapse of time no one can prove who made it. Perhaps it was not the named defendants who made it, but they did make some. Although DES was apparently safe at the time it was used, it was subsequently proven unsafe as to some daughters of some users. Plaintiffs have suffered injury and defendants are wealthy. There should be a remedy. Strict products liability is unavailable because the element of causation is lacking. Strike that requirement and label what remains "alternative" liability, "industry-wide" liability, or "market share" liability, proving thereby that if you hit the square peg hard and often enough the round holes will really become square, although you may splinter the board in the process.

The foregoing result is directly contrary to long established tort principles. Once again, in the words of Dean Prosser, the applicable rule is: "[Plaintiff] must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. *A mere possibility of such causation is not enough*; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." (*Prosser, supra*, § 41, at p. 241, italics added, fns.

omitted.) Under the majority's new reasoning, however, a defendant is fair game if it happens to be engaged in a similar business and causation is *possible*, even though remote.

In passing, I note the majority's dubious use of market share data. It is perfectly proper to use such information to assist in proving, circumstantially, that a particular defendant probably caused plaintiffs' injuries. Circumstantial evidence may be used as a basis for proving the requisite probable causation. (*Id.*, at p. 242.) The majority, however, authorizes the use of such evidence for an entirely different purpose, namely, to impose and allocate liability among multiple defendants only one of whom *may* have produced the drug which injured plaintiffs. Because this use of market share evidence does not implicate *any* particular defendant, I believe such data are entirely irrelevant and inadmissible, and that the majority errs in such use. In the absence of some statutory authority there is no legal basis for such use.

Although seeming to acknowledge that imposition of liability upon defendants who probably did not cause plaintiffs' injuries is unfair, the majority justifies this inequity on the ground that "each manufacturer's liability for an injury would be approximately equivalent to the damages caused by the DES it manufactured." (*Ante*, p. 613.) In other words, because each defendant's liability is proportionate to its market share, supposedly "each manufacturer's liability would approximate its responsibility for the injuries caused by his own products." (*Ante*, p. 612.) The majority dodges the "practical problems" thereby presented, choosing to describe them as "matters of proof." However, the difficulties, in my view, are not so easily ducked, for they relate not to evidentiary matters but to the fundamental question of liability itself.

Additionally, it is readily apparent that "market share" liability will fall unevenly and disproportionately upon those manufacturers who are amenable to suit in California. On the assumption that no other state will adopt so radical a departure from traditional tort principles, it may be concluded that under the majority's reasoning those defendants who are brought to trial in this state will bear effective joint responsibility for 100 percent of plaintiffs' injuries despite the fact that their "substantial" aggregate market share may be considerably less. This undeniable fact forces the majority to concede that, "a defendant may be held liable for a somewhat different percentage of the damage than its share of the appropriate market would justify." (*Ante*, pp. 612-613.)

With due deference, I suggest that the complete unfairness of such a result in a case involving only five of two hundred manufacturers is readily manifest.

Furthermore, several other important policy considerations persuade me that the majority holding is both inequitable and improper. The injustice inherent in the majority's new theory of liability is compounded by the fact that plaintiffs who use it are treated far more favorably than are the plaintiffs in routine tort actions. In most tort cases plaintiff knows the identity of the person who has caused his injuries. In such a case, plaintiff, of course, has no option to seek recovery from an entire industry or a "substantial" segment thereof, but in the usual instance can recover, if at all, only from the particular defendant causing injury. Such a defendant may or may not be either solvent or amenable to process. Plaintiff in the ordinary tort case must take a chance that defendant can be reached and can respond financially. On what principle should those plaintiffs who wholly fail to prove any causation, an essential element of the traditional tort cause of action, be rewarded by being offered both a wider selection of potential defendants and a greater opportunity for recovery?

The majority attempts to justify its new liability on the ground that defendants herein are "better able to bear the cost of injury resulting from the manufacture of a defective product." (*Ante*, p. 611.) This "deep pocket" theory of liability, fastening liability on defendants presumably because they are rich, has understandable popular appeal and might be tolerable in a case disclosing substantially stronger evidence of causation than herein appears. But as a general proposition, a defendant's wealth is an unreliable indicator of fault, and should play no part, at least consciously, in the legal analysis of the problem. In the absence of proof that a particular defendant caused or at least probably caused plaintiff's injuries, a defendant's ability to bear the cost thereof is no more pertinent to the underlying issue of liability than its "substantial" share of the relevant market. A system priding itself on "*equal* justice under law" does not flower when the *liability* as well as the *damage* aspect of a tort action is determined by a defendant's wealth. The inevitable consequence of such a result is to create and perpetuate two rules of law—one applicable to wealthy defendants, and another standard pertaining to defendants who are poor or who have modest means. Moreover, considerable doubts have been expressed regarding the ability of the drug industry, and especially its smaller members, to bear the substantial economic costs (from both damage awards and

high insurance premiums) inherent in imposing an industry-wide liability. (See Coggins, *supra*, 13 Suffolk L.Rev. at pp. 1003-1006, 1010-1011.)

An important and substantial countervailing public policy in defendants' favor was very recently expressed in a similar DES case, *McCreery* v. *Eli Lilly & Co., supra*, 87 Cal.App.3d 77, 86-87. Although the majority herein impliedly rejects the appellate court's holding, in my opinion pertinent language of the *McCreery* court, based upon the Restatement of Torts and bearing on the majority's "market share" theory, is well worth repeating: "Application of the comments to the Restatement Second of Torts, section 402A, to this situation compels a rejection of the imposition of liability. As the comment states, '. . . It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again, with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.' (Rest. 2d Torts, § 402A, com. k.) *This section implicitly recognizes the social policy behind the development of new pharmaceutical preparations.* As one commentator states, '[t]he social and economic benefits from mobilizing the industry's resources in the war against disease and in reducing the costs of medical care are potentially enormous. The development of new drugs in the last three decades has already resulted in great social benefits. The potential gains from further advances remain large. To risk such gains is unwise. Our major objective should be to encourage a continued high level of industry investment in pharmaceutical R & D [research and development].' (Schwartzman, The Expected Return from Pharmaceutical Research: Sources of New Drugs and the Profitability of R & D Investment (1975) p. 54.)" (*McCreery* v. *Eli Lilly & Co., supra*, 87 Cal.App.3d 77, 86-87, italics added; see also Coggins, *supra*, 13 Suffolk L.Rev. at p. 1004.)

In the present case the majority imposes liability more than 20 years after ingestion of drugs which at the time they were used, after careful

testing, had the full approval of the United States Food and Drug Administration. It seems to me that liability in the manner created by the majority must inevitably inhibit, if not the research or development, at least the dissemination of new pharmaceutical drugs. Such a result, as explained by the Restatement, is wholly inconsistent with traditional tort theory.

I also suggest that imposition of so sweeping a liability may well prove to be extremely shortsighted from the standpoint of broad social policy. Who is to say whether, and at what time and in what form, the drug industry upon which the majority now fastens this blanket liability, may develop a miracle drug critical to the diagnosis, treatment, or, indeed, cure of the very disease in question? It is counterproductive to inflict civil damages upon *all* manufacturers for the side effects and medical complications which surface in the children of the users a generation after ingestion of the drugs, particularly when, at the time of their use, the drugs met every fair test and medical standard then available and applicable. Such a result requires of the pharmaceutical industry a foresight, prescience and anticipation far beyond the most exacting standards of the relevant scientific disciplines. In effect, the majority requires the pharmaceutical research laboratory to install a piece of new equipment—the psychic's crystal ball.

I am not unmindful of the serious medical consequences of plaintiffs' injuries, and the equally serious implications to the class which she purports to represent. In balancing the various policy considerations, however, I also observe that the incidence of vaginal cancer among "DES daughters" has been variously estimated at one-tenth of 1 percent to four-tenths of 1 percent. (13 Suffolk L.Rev., *supra*, p. 999, fn. 92.) These facts raise some penetrating questions. Ninety-nine plus percent of "DES daughters" have never developed cancer. Must a drug manufacturer to escape this blanket liability wait for a generation of testing before it may disseminate drugs similar to DES? If a drug has beneficial purposes for the majority of users but harmful side-effects are later revealed for a small fraction of consumers, will the manufacturer be absolutely liable? If adverse medical consequences, wholly unknown to the most careful and meticulous of present scientists, surface in *two* or *three* generations, will similar liability be imposed? In my opinion, common sense and reality combine to warn that a "market share" theory goes too far. Legally, it expects too much.

I believe that the scales of justice tip against imposition of this new liability because of the foregoing elements of unfairness to some defendants who may have had nothing whatever to do with causing any injury, the unwarranted preference created for this particular class of plaintiffs, the violence done to traditional tort principles by the drastic expansion of liability proposed, the injury threatened to the public interest in continued unrestricted basic medical research as stressed by the Restatement, and the other reasons heretofore expressed.

The majority's decision effectively makes the entire drug industry (or at least its California members) an insurer of all injuries attributable to defective drugs of uncertain or unprovable origin, including those injuries manifesting themselves a generation later, and regardless of whether particular defendants had any part whatever in causing the claimed injury. Respectfully, I think this is unreasonable overreaction for the purpose of achieving what is perceived to be a socially satisfying result.

Finally, I am disturbed by the broad and ominous ramifications of the majority's holding. The law review comment, which is the wellspring of the majority's new theory, conceding the widespread consequences of industry-wide liability, openly acknowledges that "The DES cases are only the tip of an iceberg." (Comment, *DES and a Proposed Theory of Enterprise Liability* (1978) 46 Fordham L.Rev. 963, 1007.) Although the pharmaceutical drug industry may be the first target of this new sanction, the majority's reasoning has equally threatening application to many other areas of business and commercial activities.

Given the grave and sweeping economic, social, and medical effects of "market share" liability, the policy decision to introduce and define it should rest not with us, but with the Legislature which is currently considering not only major statutory reform of California product liability law in general, but the DES problem in particular. (See Sen. Bill No. 1392 (1979-1980 Reg. Sess.), which would establish and appropriate funds for the education, identification, and screening of persons exposed to DES, and would prohibit health care and hospital service plans from excluding or limiting coverage to persons exposed to DES.) An alternative proposal for administrative compensation, described as "a limited version of no-fault products liability" has been suggested by one commentator. (Coggins, *supra*, 13 Suffolk L.Rev. at pp. 1019-1021.) Compensation under such a plan would be awarded by an administra-

tive tribunal from funds collected "via a tax paid by all manufacturers." (P. 1020, fn. omitted.) In any event, the problem invites a legislative rather than an attempted judicial solution.

I would affirm the judgments of dismissal.

Clark, J., and Manuel, J., concurred.

Respondents' petitions for a rehearing were denied May 7, 1980. Tobriner, J., did not participate therein. White, J.,* participated therein. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the petitions should be granted.

---

*Assigned by the Chairperson of the Judicial Council.