## DOMBROFF v. ARMSTRONG CORK COMPANY, et al.
### Case No. 79-14048 (12)
Eleventh Judicial Circuit, Dade County
August , 1981

Louis Robles, Robles & Robles, for plaintiff.
M. Stephen Smith, III, Esq., Dixon, Dixon, et al., for defendant.

CHARLES D. EDELSTEIN, Acting Circuit Judge

This is a wrongful death action filed by the personal representative of the deceased who died, in 1978, allegedly from exposure to asbestos which occurred during his employ in a Maryland shipyard from 1941 through 1945. This is a product liability case in which the plaintiff is apparently unable to prove which of the defendants, if any, caused the death. Plaintiff seeks application of various theories to relieve her of this burden. See *C.A.Hardy v. Johns Mansville Sales Corporation*, M 79-145 (D.C.E.D. Tex 5/6/81) and *Sindell vs. Abbott Laboratories*, 607 P.2d 924 (Cal. 1980).

A review of some aspects of products liability is in order. In general, "One who sells any product in a defective condition unreasonably dangerous to the user or consumer is subject to liability for physical harm thereby caused to the ultimate consumer or user". Restatement of Torts Section 402 A (1965), adopted in Florida in *West v. Caterpillar Tractor Co.*, 336 So.2d 80 (Fla. 1976). A product is defective if it is unreasonably dangerous or not reasonably safe to the ultimate consumer or user. Some products may be "unavoidably unsafe" (Rest. Torts Section Torts 402 A comment k) in that they are incapable of being made safe yet the benefits from their use may negate strict liability.

The utility of insulation and other products containing possibly carcinogenic or otherwise dangerous asbestos may outweigh the known or foreseeable risks to workers or others and justify their being marketed. The product would still be "unreasonably dangerous" and this fact would give rise to additional duties on part of manufacturers. Particularly where the manufacturer has the skills and knowledge of an expert and those who might work with the product or be exposed to it do not, the manufacturer has duties to: adequately test and inspect the product (*Borel v. Fiberboard Paper Products Corporation*, 493 F.2d 1076, 5 Cir. 1973, cert. den. 419 U.S. 869, 1974); to monitor the product's performance once distributed (c.f. *Sindell supra* p-7); to warn potential users or consumer of the dangers of the product (*See Dayton Tire and Rubber Co. v. Davis*, 348 So.2d 575, Fla. 1 DCA 1977) and to recommend user protective devices or safer ways of working the product (*Borel, supra*). The extent of these duties is related to the risk and severity of the possible harm balanced against the costs of meeting these duties. c.f. Rest Torts Section 291-293 (1965); 2 Harper & James, *The Law of Torts*, Section 16.9, 28.4.

Exposure to asbestos can cause a number of harmful or even fatal illnesses. Pulminary asbestosis is an irreversible, non-malignant scarring of the lungs, characterized by clubbing the fingers and cyanosis. It results from exposure to certain kinds of asbestos dusts and fibers. Mesothelioma is a form of cancer that is extraordinarily painful and always fatal. A single exposure is sufficient to cause the illness which is characterized by malignant tumors of the chest, lungs and abdomen. It has a long latency period and normally is responsible for 1 in 10,000 deaths in the general population. Finally lung cancer (bronchogenic carcinoma) and gastrointestal carcinoma both may be associated with exposure to asbestos. See generally, *Comment: Asbestos Litigation: The Dust Has Yet to Settle*, 47 Fordham Urban Law Journal 55 (1980) (hereinafter "Asbestos Litigation"); *Borel, supra*, and *C.A. Hardy, supra*. These diseases can be contracted by persons working in or residing near asbestos application and/or removal sites; by persons living in the household of an asbestos worker as well as asbestos workers themselves.

The dangers from asbestos exposure were reflected by a number of workman's compensation claims filed in the early 1930's. Contemporaneous studies by the Metropolitan Life Insurance Company and the U.S. Public Health Service confirmed some previously raised concern regarding exposure to asbestos. See "*Asbestos Litigation*", *supra* at pp. 58-59 and Ellman, *Pneumoconiosis*, 14 Brit J. Radio. 361 (1934); Dresson et al., *A Study of Asbestosis in the Asbestos Textile Industry*, Public Health Bull. No. 241 (1938) and *Borel supra*.

Despite these warnings and numerous others, the industry failed to inform users and potential ultimate consumers of these dangers. According to the then Secretary of Health, Education and Welfare Joseph A. Califano, over 67,000 persons die each year from cancer alone contracted as a result of exposure to asbestos. See *"Asbestos Litigation" supra* at p. 55. Moreover, more than 2.1 million individuals are expected to die prematurely from abestos exposure. See National Cancer Institute and Environmental Health Services, *Estimates of the Fraction of Cancer Incidence in the United States Attributable to Occupational Factors.* Draft Summary September 11, 1978. This report was quoted in *"Asbestos Litigation"* as follows:

> According to estimates made by the U.S. Department of Health, Education and Welfare between eight and eleven million workers have been exposed to asbestos in the U.S. since the beginning of World War II. Of the total, approximately 1.5 to 2.5 million are presently employed, while the remainder between 6.5 and 8.5 million workers—were formerly employed in environments with significant asbestos exposure, including 4.5 million who worked in shipyards during World War II. Of these workers, approximately four million are believed to have had heavy exposure to asbestos. Based on epidemiological studies of workers, it is estimated that 20-25 percent of heavily exposed workers die of lung cancer, 7-10 percent of pleural or peritoneal mesothelioma, and 8-9 percent of gastrointestinal cancers. These figures are probably underestimates of lifetime risks, because relatively few workers have yet been followed to the end of their normal lifespan. The total fraction of heavily exposed workers likely to die of these cancers is probably between 35-44 percent. Of the four million heavily exposed workers, approximately 1.6 million are thus expected to die of asbestos-related cancers. Assuming that the excess risk to the 4-7 million less heavily exposed worker is one-quarter of that the heavily exposed worker, the total number of cancers associated with asbestos in less-heavily exposed group would be expected to be about 0.55 million, raising the total to about 2.5 million.

Asbestos is particularly valuable as an insulator to minimize heat loss or to protect from heat or fire and as structural reinforcement for cement and asphalt. Over one million pounds is consumed annually by industry.

Plaintiff is apparently unable to prove whose product caused decedent's death. The alleged exposure took place more than 35 years ago. Time has apparently dimmed memories, scattered remaining witnesses and

destroyed records. The long latency period makes early diagnosis difficult and unavoidably puts plaintiff to a difficult task to meet traditional notions of causation. Accordingly, plaintiff would have the court adopt some form of the various alternative theories set forth in the above cited cases.

Defendants argue that Plaintiff is foreclosed by our Supreme Court's ruling in *West supra* and subsequent cases. A similar argument was raised in *C.A. Hardy supra* p. 7 note 13. It was there urged that *Gray v. United States*, 445 F. Supp. 337 (S.D. Tex. 1978) precluded the application of these alternative theories. "Gray adhered to the rubric of products identification; it did not expressly or implicitly consider an application of enterprise liability. Therefore, its holding is not dispositive". *West* is similar to *Gray* in that it cited a general rule in a factual setting in which there was no issue of product identification raised or considered. The issue raised by the parties herein, is one of first instance in Florida. Our rules once provided a means for certification of such issues to state appellate courts but its repeal requires this court to rule upon the issue.

The relevant cases are *C.A. Hardy, supra, Hall v. E.I. DuPont de Nemours*, 345 F. Supp. 353 (C.D.C. N.Y. 1972) and *Sindell supra*.

In *Hall*, the six defendants who manufactured blasting caps and who comprised the entire domestic industry were sued along with their trade association. The Plaintiff apparently could not identify the particular manufacturer of the injury producing blasting cap. The Plaintiff therein pressed what one writer (Comment: *Enterprise Liability* 46 Fordham L.R. 936), has called the concert of action theory to establish the defendant's duty, arguing that defendants through their trade association agreed not to warn of the products danger. The *Hall* Court found that joint liability had been traditionally imposed on multiple defendants who exercise collective control over a risk creating product. The Court reviewed application of respondeat superior, inherently dangerous activity and nondelegable duty theories and found them imposing a duty under what it called "enterprise" liability.

> "To establish that the explosive industry should be held jointly liable on enterprise grounds, Plaintiff . . .will have to demonstrate joint awareness of the risks at issue in this case and their joint capacity to reduce or effect those risks" *Hall supra* p. 378.

As to causation, Judge Weinstein relied upon *Rest. of Torts* Section 433 B (3) (The alternative liability theory) to shift the burden of proof of causation to the defendants were an injury might have occurred due to tortious acts by one of several defendants. Under this theory, where

all defendants behave tortiously but only one may have caused the injury, all are liable, the focus being on tortious conduct.

In sum, in order to create liability under what the Court called enterprise theory, plaintiff must establish the duty owed (their concerted action in failing to warn); and causation, a casual connection between the group created risk and the injury caused by at least one member of the group. Moreover, despite the fact that foreign and defunct unsued blasting cap manufacturers might have made the injury producing product, plaintiff's burden of proof is unchanged.

> "If plaintiff can establish by a preponderance of the evidence that the injury-causing caps were the product of some unknown one of the named defendants, that each named defendant breached a duty of care owed to plaintiff and that these breaches were substantially concurrent in time and of a similar nature, they will be entitled to a shift of the burden of proof on the issue of causation". *Hall* at 381.

*Sindell* was a "DES" case. DES was a miscarriage prevention drug prescribed to millions of women from 1941 to the early 1970's. Plaintiffs were the offspring of mothers who had ingested the drug. Of the 200 or so drug companies manufacturing DES, only a handful were joined. DES was found to be carcinogenic, having a latency period of 10 to 12 years. The manufacturers allegedly failed to properly test and monitor the drug's effects, to warn regarding its hazards and to limit its marketing. DES manufacturers collaborated marketing the drug, relied upon each others testing, and adhered to industry standards. Moreover, all of the drug was produced from the same formula.

Plaintiff could not identify the manufacturers of the exact drug her mother ingested and raised three theories to impose liability; concerned action, enterprise and alternative liability. The court rejected the alternative liability theory on causation grounds. It referred to the classic application of this theory which stemmed from *Summers v. Tice*, 199 P.2d 1 (Cal. 1948). There, two hunters discharged their weapons, the bullet of one striking Plaintiff. Plaintiff could not prove which of the two defendants caused the injury yet liability was imposed on both defendants. The Court reasoned that it would be unfair to Plaintiff to require proof of causation when both defendants were clearly tortfeasors. The Court noted that in *Summers*, all possible defendants were joined, where in DES, only a handful of 200 or so manufacturers were joined. So the Court found there was a 50 percent chance either of the hunter's bullets struck the Plaintiff while anyone or perhaps none of the DES defendant-manufacturer's made the poisonous pill.

The *Sindell* majority also found the concert of action Rest; Torts; Section 876 theory wanting.

> "The gravamen of the charge of concern is that defendants failed to adequately test the drug or to give sufficient warning of its dangers and that they relied upon the tests performed by one another and took advantage of each others promotional and marketing techniques. These allegations do not amount to a charge that there was tacit understanding or common plan among defendants to fail to conduct adequate tests or give sufficient warnings. . . ."

Moreover, the use of a common formula was not sufficient to show concerted action.

Finally, *Sindell* rebuffed the proffered enterprise theory "suggested in *Hall v. E.I. Dupont de Nemours*". *Sindell* at p. 933. First said the Court, *Hall* involved six manufacturers who comprised the whole domestic blasting cap industry whereas DES was manufactured by at least 200 firms. Moreover, the *Hall* Court warned against application of the doctrine to a large number of defendant producers.

Third, DES producers did not control the risk by delegating some safety functions to their trade association. Fourth, Federal regulatory standards controlled much of the DES makers activities and finally fifth, there was insufficient evidence of concerted action.

The Supreme Court of California cited the following reasons for its ultimate holding:

> "Should we require that plaintiff identify the manufacturer which supplied the DES used by her mother or that all DES manufacturers be joined in the action, she would effectively be precluded from any recovery. . (I)n our contemporary complex industrialized society, advances in science and technology create fungible goods which may harm consumer and which cannot be traced to any specific producer. . (T)he most persuasive reason for finding plaintiff states a cause of action is that advanced in Summers: as between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury. . "

> "(D)efendants are better able to bear the cost of injury resulting from the manufacture of a defective product. As was said by Justice Traynor in Escola, (T)he cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, can be insured by the manufacturer and distributed among the public as a cost of

doing business. . . (T)he manufacturer is in the best position to discover and guard against defects in its products and to warn of harmful defects; thus, holding it liable for defects and failure to warn of harmful effects will provide an incentive to product safety. . . (T)hese considerations are particularly significant where medication is involved, for the consumer is virtually helpless to protect himself from serious, sometimes permanent, sometimes fatal, injuries caused by deleterious drugs. . '' (cites omitted.)

This language seems to impose liability and apportion damages upon the likelihood that each manufacturer's product harmed someone though perhaps not the plaintiff therein. To impose libility, the *Sindell* court requires plaintiff to join the maufacturers who have a substantial share of the relevant market. This protects a likely innocent defendant from liability. Five manufacturers out of 200 imposes this risk, while 5 manufacturers who comprise 90 percent of the market greatly reduces this risk.

The *Sindell* majority rejected *Hall* and *Summers* joint and several liability for damages in favor of some form of apportionment. Unfortunately, the court was less clear on damage apportionment than on causation. The following illustrates the point:

If plaintiff joins three manufacturers who each have 25 percent of the market (for a total of 75 percent) is each responsible for (a) ⅓ of *all* of plaintiff's damages or (b) ⅓ of 75 percent of plaintiff's damages? A careful reading of the opinion leaves this reader in doubt as to which rule the court adopted.

Judge Parker in *C.A. Hardy, supra,* confronted by this doctrinal confusion found the key in both *Hall* and *Sindell* to be the inability of plaintiff to identify the precise causation agent. "In *Hall,* product identification was impossible because of the nature of the product itself—blasting caps. The *Sindell* problem bears a greater relation to the passage of time and the latency period. . . '' The asbestos cases raise similar problems in his view, i.e. the impossibility of Plaintiff's isolating the precise exposure or identifying the particular manufacturers product; the long latency period of mesotholioma and the cumulative nature of asbestos which is ''basically inconsistent with the legal concept of proof of a precise causation agent.'' So the Court said it was adopting some form of enterprise liability in asbestos related cases.

Judge Parker left precise definition of the relevant market and perhaps greater clarity of other rule he adopted for a later hearing since his ruling arose in the context of discovery and crossclaim motions.

Ordinary tort actions encompass the following issues:

1. What is the scope of the duty owed by the defendant?

2. To whom does this duty extend?

3. Did defendant breach this duty causing an injury to plaintiff?

4. If there are multiple tort feasors, how are damages to be apportioned?

Duties arise from the relationship of the parties, their respective activities and the impact of their behavior on each other and society. Tort law emerges from the facts guided by general principles of the common law.

To contract abestosis one must be exposed to asbestos. One exposure can conceivably be fatal. Exposure to asbestos significantly increases the likelihood of contracting mesotholioma, bronchogenic carcinoma and gastro-intestinal carcinoma. See *Asbestos Litigation, supra* for several pages of data. The long latency period coupled with the cumulative nature of exposure makes precise proof of causation nearly impossible through no fault of plaintiff. There are probably more than 100 firms manufacturing some form of asbestos bearing products, some of them of recent origin. These products are useful and perhaps vital. Annually, over one million pounds of asbestos are used commercially, presumably earning significant profits for its over 100 manufacturers and distributors. Arguably, since the 1930's the industry knew or should have known of the dangers, and despite this knowledge, it failed to warn the consumer and has even been charged with willful attempts to supress this information. See *Asbestos Litigation* at pp. 55-62.

The defendant's conduct may be improved by holding them liable. Certainly they are in a position to spread the risk and cost directly to asbestos users and ultimately to society as a whole. On the other hand, due process would seem to dictate that a totally innocent defendant, at least as regards to the plaintiff herein, should not be required to bear the burden of other's conduct. Moreover, there must be a reasonable relationship between fault and responsibility in damages. Unlike DES, apportioning fault presents difficult problems since asbestos comes in an endless variety of products containing widely varying amounts of dangerous material and is used in many different ways. The risk of harm can depend upon one's proximity to the location where asbestos is used and upon the duration, intensity, frequency of exposure.

For all of these reasons the court holds that a manufacturer of asbestos containing products has the duty to test its products for safety,

to fully warn of the known or reasonably knowable dangers of its products, to monitor their usage and to recommend the safest reasonable means of using them. These duties extend to users and ultimate consumers.

The manufacturers, having unleashed a dangerous product, may be liable to those likely injured by its product in proportion to its share of the relevant market in which plaintiff was injured, taking into consideration the unique nature of asbestos discussed above. Plaintiff must join those manufacturers of a substantial share of asbestos which plaintiff's decedent might have been exposed to during 1941-1945 at similar facilities. See *Sindell, supra,* at 937. The defendant must exonerate itself or contest apportionment with its co-defendants. Of course, each defendant has the opportunity to interplead other, possibly responsible manufacturers.

To establish liability for each defendant, plaintiff must prove by a preponderance of the evidence:

1. The product manufactured by each defendant sought to be held liable contained asbestos of a type that could have caused the decedent's injury.

2. The product manufactured by each defendant sought to be held liable was manufactured and distributed during the time decedent was allegedly exposed to its product.

3. The product manufactured by each defendant sought to be held was the *kind customarily used in shipyards in the relevant market area* in which the alleged exposure occurred and of the time of the decedent's alleged exposure.

4. The likely effect of exposure to the product manufactured by each defendant sought to be held liable taking into account:

   (a) the manner in which the material was ordinarily used in *shipyards in the relevant market area* at the time of plaintiff's exposure.

   (b) the percentage concentration of harmful material in the product and its toxicity.

5. The length of time plaintiff's decedent worked in areas where he might have been exposed to defendant's asbestos products.

Plaintiff need not prove that the precise product of each defendant actually caused the injuries nor must she prove that exposure to asbestos

can cause them. (See *C.A. Hardy, supra*, III). Once plaintiff meets her burden, the defendant must come forward with sufficient evidence to demonstrate it did not cause the injury.

Damages should be apportioned using the following factors:

(a) the total amount by weight, and/or volume of the type of product injuring plaintiff's decedent distributed in the relevant market at the time of the exposure;

(b) the gross dollar amount of sales of the aforesaid product;

(c) the asbestos percentage of the harmful material;

(d) severity of the harmful exposure to the product in the manner in which it was customarily used at the time and place of decedent's exposure;

(e) the gross dollar amount of sales of the aforesaid product, taking into account the likely duration, intensity and frequency of decedent's exposure.

The burden of apportionment among defendants is theirs. Since plaintiff will be required to join those who have a substantial share of the relevant market, there are no due process problems in requiring each defendant to be responsible for its proportionate share of all the plaintiff's injuries represented by each manufacturers share of the relevant market. Reverting to the previous example at page 8, of this opinion the rule in subsection "a" is adopted herein. Moreover, a defendant can join others and thereby reduce its respective share for plaintiff's injuries.

In sum, both the *Sindell* theory as modified above, and the concert of action theory from *Hall* may be available to plaintiff. The burden of pleading and proof is on plaintiff.

A simple rule is adequate for simple cases; a complex rule is necessary given the complexity of the product, the long latency period, its use and distribution. Ultimately we have traditionally trusted well instructed juries to make the abstract, concrete.

For these reasons defendants' motions for summary judgment or on the pleadings (the latter being treated as the former, see *Sindell, supra*, note 3) are denied on the issue of liability. On the question of jurisdiction, the Court wishes further argument and the presentation of evidence. Specifically when does the cause of action accrue; at exposure to the product, when the disease was or should have been discovered, when

decedent dies or some other time? Further, what was the nature of each defendant's activities in Florida during each of these periods?

Since the motion for change of venue rests in part upon the status of the defendants remaining, the Court reserve ruling thereon.