MCKEE, Circuit Judge,
concurring, joined by RESTREPO, Circuit Judge.
While I agree that summary judgment is appropriate here, I write to stress that the law in this area is simply inadequate to address claims arising under the Price-Anderson Act based on exposure to excess radiation.
As the Majority explains, this is a Public Liability Action under the Price-Anderson Act.[1] Federal law therefore controls our inquiry into whether Defendants owed Plaintiffs a duty, and if so, whether the duty was breached. State law controls the inquiry into whether the breach, if proven, caused Plaintiffs’ injuries.[2] As I will explain, existing law places an almost insurmountable burden on plaintiffs who try to recover under the Price-Anderson Act. Under the existing law, Plaintiffs cannot establish causation, even if they have established that Defendants owed them a duty that was breached.
Suits for injuries allegedly resulting from radiation exposure have no analogous counterpart in traditional tort law, and existing law ignores the unique problems inherent in claims based on exposure to “manmade” radiation. As a result, plaintiffs will rarely, if ever, recover in these types of actions, and this will continue *275 unless states (or Congress) recognize the unique problems endemic in proving that a plaintiffs illness was proximately caused by exposure to radiation from a given facility or event,
I. BREACH OF DUTY
I believe that Plaintiffs’ submissions (as itemized in the Majority Opinion) are more than adequate to survive Defendants’ motion for summary judgment as to breach of duty.[3] For example, an internal memorandum, dated November 29, 1972, regarding NUMEC’s meeting with AEC Compliance stated:
P. Nelson [AEC personnel] opened by explaining the purpose of the meeting. He stated that Compliance was concerned about the recurring nature and seriousness of NUMEC violations. He explained that the AEC could now impose civil penalties for those types of violations... .NUMEC has been the worst offender of AEC regulations over the years.... AEC had given NU-MEC a grace period after the B&W takeover, but that little improvement was evident. The AEC is strongly considering imposing civil penalties against NUMEC.[4]
Another letter from the AEC stated: “It appears that certain of your activities were not conducted in full compliance with ... and the requirements of the AEC’s ‘Standards for Protection Against Radiation,’ Part 20, and ‘Special Nuclear Material’....”[5] Based on this, there could be enough evidence to support Plaintiffs’ claimed breach of duty.
The Majority affirms the District Court’s conclusion that much of Plaintiffs’ evidence is of either limited value or irrelevant because the only expert whose testimony survived the Dmbert motion (Dr. Melius) primarily focused on radiation levels at the stacks or vents and not at the roof top boundary.[6] Although I agree that Plaintiffs must establish the levels of radiation at the roof boundary rather than levels at the vents or stacks, levels at the vents or stacks could nevertheless be very relevant to establishing levels at the boundary if that evidence had been properly developed. This follows from the fact that different radioactive substances have different half-lives. I will not wade into the quantum mechanical weeds of half-lives here as that was discussed in some detail in our 1999 opinion in In re TMI Litigation (TMI II ).[7] Rather, I will merely note that half-lives vary from as short as less than a second to as long as many billions of years, depending on the substance involved.[8] Accordingly, if byproducts of the uranium produced at Defendants’ facility included substances with sufficiently long half-lives, their levels at the stacks and vents would be very relevant to determining exposure at the roof boundary and beyond. A fact finder could readily conclude that the levels at the vents and stacks persisted with no discernable diminution (even after allowing for dilution as they dispersed into the surrounding community) long enough for residents of the community to be exposed to those levels. The probative value of this evidence could be particularly compelling if the effluents that comprise the byproducts of uranium production are not otherwise found in the *276 environment. They would thus become much more analogous to toxins that cause diseases such as mesothelioma which I discuss in more detail below.
However, we do not know the extent to which byproducts of uranium production have an exceedingly short half-life or whether they have exceptionally low energies. If they-have a momentary short half-life or exceptionally low energies, their presence at- the stacks and vents would be irrelevant to determining levels at the roof boundary. This is because they would have disintegrated- into sub particles before reaching the roof boundary and would likely not have had enough energy to cause any damage even if they reached the roofs perimeter and beyond into the community. Plaintiffs did not offer any evidence that would allow a fact finder to conclude that the.levels at vents and stacks persisted at the roof boundary. Accordingly, evidence of the levels, at the stacks and vents cannot satisfy their burden of establishing a breach at the relevant point — the roof boundary.
■. I also have reservations about the Majority’s conclusion that 10 . ,C.F.R. .§ 20.106(a) requires averaging as opposed to merely allowing Plaintiffs to average exposure over a year.[9] However, here again, Plaintiffs’ proof is deficient because they did not attempt to introduce any evidence about the actual content of the uranium effluent that was discharged. If that effluent contained substances that were particularly toxic (such as plutonium), exposure to a given amount for a few days (perhaps even for a matter of hours) could cause cancer even though the exposure would appear minimal when averaged out over a year.[10] There is an even more fundamental problem with Plaintiffs’ case that prevents them from surviving summary judgment, and that is why I feel compelled to write separately.
In order for Plaintiffs to succeed, they must do more than show a breach of a duty resulting in exposure to excess radiation. They must show that the breach resulted in an exposure that proximately caused their injuries. It is here that Plaintiffs’ claims fail regardless of the quality of all of their other proof. Thus, even assuming a genuine issue of fact as to the exposure levels and Defendants’ breach, the evidence is still not sufficient to defeat summary judgment under the Price-Anderson Act because causation is lacking.
II. CAUSATION
A. The Problems of Radiation Toxicity
The Majority thoroughly and correctly explains • causation as it applies to “toxic torts” under Pennsylvania law. However, the legal principle of causation has evolved from suits arising, from exposure to man-made toxic substances such as asbestos. As the Majority notes, mesothelioma is caused by exposure to asbestos, and it is therefore a “signature” disease. The disease almost never occurs absent exposure to asbestos.[11] The problems of proof in such cases are quite similar to problems of causation in cases involving polychlorinated biphenyls *277 (PCBs)[12] or pneumoconiosis (black lung disease),[13] to name but a few of the pathological byproducts of modernization. In such cases, a pathology is caused- by contact (usually ingestion) with a foreign substance that the injured.person would.not have otherwise been exposed to, or would have been exposed to only in relatively insignificant quantities, and that pathology almost never occurs in the absence of exposure to that toxic substance. Accordingly, causation can be established by showing that defendant made (or controlled) a substance, plaintiff has a disease that almost never occurs absent contact with defendant’s substance, and plaintiff had sufficient contact with defendant’s product (i.e. “frequency, regularity, and" proximity of exposure”) to allow a fact finder to conclude that the defendant’s product was a substantial factor in the plaintiffs death or injury.[14] Radiation is different.
In TMI II, we discussed the “scientific principles regarding the relationship between radiation and cancer.”[15] As the Majority explains, “[mjanmade ionizing radiation can damage human cells.”[16] An ion is nothing more than an electron that has been displaced from its orbit.[17] Unlike with PCBs, asbestos or tobacco byproducts, we are constantly exposed to radiation on a daily basis. We are exposed from numerous natural sources including the sun,[18] or naturally occurring radioactive elements such as radon in the ground surrounding our homes.[19]
It is now beyond dispute that radiation can cause various types of cancer. However, unlike with asbestos and diseases, such *278 as mesothelioma, radiation wreaks havoc with our bodies, not because it is a foreign substance (it is not), but because it transfers extra energy to our cells. This energy can, in turn, damage our DNA in numerous ways that are described in detail in TMI II.[20]
Asbestos fibers cause mesothelioma by damaging the “mesothelial cells that control cell reproduction. Some damaged cells die and tumor suppressor genes stop others from reproducing.”[21] However, “[wjhere suppressor genes do not stop the reproduction process, ... the damaged cells divide, replicating the damage in the sister cells.”[22] Over decades of continued growth of these cells, tumors develop. “This explains why mesothelioma has an extremely long latency period, as mesothe-lial cells have a very slow growth rate.”[23] As expert testimony in a recent case from the Supreme Court of Pennsylvania established, “it is not scientifically possible to identify the particular exposure or exposures that caused a patient’s mesothelio-ma[.j ... [Ijnstead, the causative agent is ‘the series of exposures.’ ”[24] However, even though it is not possible to identify a particular exposure as causing a given occurrence of the disease, there is now no dispute that asbestos is responsible for mesothelioma.
Although the disease process described above for mesothelioma is quite similar to that which is triggered by radiation after the cell is irradiated, there is a key difference that is very relevant to our discussion. As noted above, we do not normally develop diseases such as mesothelioma in the absence of exposure to the manmade carcinogens that can cause it. Thus, if a plaintiff can produce evidence of sufficient frequency, regularity, and proximity of exposure to asbestos to establish that it is more likely than not that that exposure was a substantial cause of subsequent disease, the plaintiff then need only prove that defendant manufactured or controlled the substance that plaintiff had been exposed to in order to recover. The same is true with any other “signature” disease.
Unlike products such as asbestos and PCBs, radiation is not a foreign substance. All of us are exposed to it every second of every day both inside of buildings and outdoors. Yet, radiation can “damage structures within the human body as cells are disrupted or killed by the ionizing radiation [energy] itself, and as energy is transferred to cells triggering second-order chemical changes.”[25] “Unlike a chemical product, which may be traceable to a particular manufacturer, different sources of radiation are not distinguishable, nor is there any noticeable difference between cancers caused by nuclear-power production and those caused by other sources of radiation.”[26]
[Mjedical evaluation, by itself, can neither prove nor disprove that a specific malignancy was caused by a specific radiation exposure [or series of expo *279 sures]. Therefore, the primary basis to link specific cancers with specific radiation exposures is data that has been collected regarding the increased frequency of malignancies following exposure to ionizing radiation. In other words, causation can only be established (if at all) from epidemiological studies of populations exposed to ionizing radiation.[27]
However, epidemiological studies of exposed populations can only establish the percentage by which the incidence of given cancers in that population exceeds the rate for those same cancers in similar populations not exposed to the source of radiation. No study can determine whether the cancer of a given member of that population was the result of exposure to a defendant’s product or to radiation released from a defendant’s .facility. As we explained in TMI II, “the task of establishing causation is greatly complicated by the reality that a given percentage of a defined population will contract cancer even absent any exposure to ionizing radiation.”[28] This probability conundrum is even more of an issue when we try to compare members of a population who have only been exposed to natural radiation with members of the same population who have been exposed to that radiation plus radiation emanating from a defendant’s product or facility.
Plaintiffs who must prove that exposure to a particular source of radiation was a substantial cause of their injuries therefore face an insurmountable task that the law has yet to satisfactorily address. The task is further complicated by the fact that radiation includes different kinds of particles (i.e. alpha, gamma, beta), each with different properties including different levels of energy and thus having a different capability of damaging human cells.[29] As the NRC has explained:
[NJatural radiation ... is always present in the environment. It includes cosmic radiation which comes from the sun and stars, terrestrial radiation which comes from the Earth, and internal radiation which exists in all living things. The typical average individual exposure in the United States from natural background sources is about 300 millirems per year.[30]
Yet, although there is general scientific agreement that radiation can cause cancer, we are still at the rudimentary stages of understanding the etiology of cancers.[31]
As if this does not make plaintiffs’ task in such cases difficult enough, two additional considerations further complicate inquiries into cáusation. First, as has already been mentioned, not all radiation has the same energy level. Some radiation can be filtered out by barriers no more substantial than sunscreen, or surface tissue, yet some radiation is capable of penetrating lead.[32] Thus, mere proximity to a source of radiation does not necessarily establish a sufficient “absorbed dose” to link an individual’s illness to that proximity.[33] This point is illustrated in the extreme by the fact that “[c]rews of nuclear submarines *280 have possibly the lowest radiation exposure of anyone, despite living within a few meters of a nuclear reactor, since they are exposed to less-natural background radiar tion than the rest of us [ (the ocean shelters them) ], and the reactor compartment is well shielded.”[34]
Second, the difficulty of linking a potentially radiation-related pathology-to a defendant instead of to background radiation is made exponentially more difficult by the fact that some people have a genetic predisposition to diseases associated with radiation exposure, while others have a genetic composition that seems to protect them from the otherwise harmful effects of radiation. Indeed, more than one physician has counseled that the best way to. guard against contracting cancer is to. “choose your parents carefully.”[35] Genetic research has even led researchers to conclude that;
[P]erhaps a fortunate genetic endowment protects some lifelong smokers from lung cancer, while a genetic mischance induces lung cancer in some nonsmokers, Both environmental and genetic differences between individuals appear responsible for at least some of the variation in individuals’ responses to toxic exposures.- For the most part, it has been impossible (or at least impractical) to identify, quantify, and tease apart these possibilities using the investigatory tools of toxicology, environmental epidemiology, conventional biochemistry, and classical genetics.[36]
Yet, Plaintiffs such as those here, must produce evidence that will establish that their injuries are more likely than not caused by effluents from Defendants’ uranium plant. I simply do not see any way they can do that given the current state of the law.
B. Congress’s Response to Causation Issues
• Congress has recognized the problems inherent in attempting to prove causation in Public Liability Actions almost from the very beginning of our attempts to. harness the power of the atom. The Atomic Energy Act of 1946 created the Joint Committee on Atomic Energy to. correct the deficiencies of the Price-Anderson Act, including the stringent burden of establishing causation.[37] The Committee was also concerned *281 with state statutes of limitation that could nullify meritorious claims because of the latency of injuries caused by radiation.[38] Consequently, the 1966 amendments to the Act included a provision for the waiver of various defenses under state tort law in the event of an “extraordinary nuclear occurrence.” [39] An “extraordinary nuclear occurrence” was defined as:
[A]ny event causing a discharge or dispersal of .., byproduct material from its intended place of confinement in amounts offsite, ... which the.Nuclear Regulatory Commission or the Secretary of Energy ... determines to be substantial, and which the Nuclear Regulatory Commission or the Secretary of Energy ... determines has resulted or will probably result in substantial damages to persons offsite'... .[40]
“This provision was enacted in order to assure that the victim’s entitlement to compensation would be determined under a strict liability standard, instead of the negligence standard that most state courts require.”[41] The amendments also included a provision that waived state statutes of limitation that were more limited than the three-year limit established under the Price-Anderson Act.[42] However, the overarching problem of causation was not impacted by attempts to augment statutes of limitation or impose strict liability. In either case, a plaintiff would still have to establish that a • given pathology was caused by exposure to a defendant’s radiation rather than background radiation, heredity or some other factor. Accordingly, this legislative effort was only helpful in the exceedingly rare cases where that evi-dentiary gap could be bridged.
In 1988, Congress.created the Presidential Commission on Catastrophic Nuclear Accidents to “conduct a comprehensive study of appropriate means of fully compensating victims of a catastrophic nuclear accident that exceeds the aggregate public liability .... in the statute....”[43] In its final report to Congress, the Commission “sought to identify the ‘next best’ approach, since attaining the ‘best’ solution, compensating only those whose cancers or other latent illnesses were caused by the accident, is- not currently possible.”[44] The options included:
Option A, relaxing traditional notions of proof of causation and paying something to everyone who gets cancer; Option B, retaining and rigorously applying traditional standards, .which would result in paying few, if any, claims; and Option C, adopting sonie proxy for direct proof of causation, such as imputing group risk to individuals who actually develop cancer and paying those claims where the association between radiation exposure *282 and a particular cancer is the strongest (or at least at some minimum level), with the option, where a strong association is required for a “full” award, of also paying lesser amounts on those claims with a somewhat weaker association.[45]
The Commission ultimately recommended Option C[46] and provided three possible ways to implement that Option, while noting that better techniques can be developed in the future:[47]
The first would pay the full amount for any diagnosed cancer where the probability of causation (PC) is .5 or greater, and a declining amount down to a cutoff of PC = .2, at which compensation would be 20 percent of the full award, determined in accordance with Chapter 3.
The second variation would pay the full amount for any diagnosed cancer where the PC is .5 or greater, and a declining amount down to a PC of .2, at which compensation would be 30 percent of a full award.
The third variation, which is most like Option A, above, would simply pay a benefit to anyone in the affected area with a diagnosed cancer whose radiation exposure indicated a PC of 20 percent or greater. Congress might elect to make this a full award determined in accordance with Chapter 3, or a fixed dollar amount, or reimbursement for actual medical expenses.[48]
Courts have adopted variations of these and other options as discussed below. However, despite these efforts, the problem of establishing causation in these suits remains because we continue to approach such claims the same way we approach injuries resulting from asbestos, defective brakes, holes in pavement, and falls in the aisles of the neighborhood supermarket.
C. Evolving Case Law: Relaxing Standards
Some courts have responded by implementing a more relaxed analytical framework for these suits. None of these approaches has yet won general acceptance, and each contains certain flaws.[49]
1. The Preponderance Rule
The preponderance rule is very similar to the typical preponderance of the evidence burden. It requires a plaintiff to prove that the defendant’s activity was more likely than not either the but-for causation or a substantial factor in causing the plaintiffs injuries.[50] Courts have equat *283 ed the “more likely than not” element of this rule to a level of certainty greater than 50%.[51] The preponderance rule does not reduce a plaintiffs burden of showing cause-in-fact, it allows the plaintiff to present individualized and statistical evidence to establish that the defendant’s activities were likely a substantial contributor to plaintiffs injury.[52]
Because of the 50% threshold requirement, plaintiffs who cannot demonstrate a greater than 50% likelihood that the defendant caused their injuries do not recover anything. However, if plaintiffs are able to show, for example, that defendant is responsible for causing injuries to 51% of the exposed population, every plaintiff recovers even though the evidence only proved that 51% of the individuals in the exposed population suffered injuries because of defendant’s activities.
This is basically the way causation is now determined in Pennsylvania, as explained in the Majority’s discussion of Rost v. Ford Motor Co.,[53] except that it allows group recovery if any group member of the group is successful in showing his/her disease was proximately caused (i.e. by a 51% probability) by a defendant.
There are several obvious problems with this approach. As we have explained above, because everyone in the population will have been exposed to radiation during their lifetime, and since it is not yet possible to isolate the effect of radiation from a particular source, the same problems of causation remain. This approach merely suspends proof of causation for everyone else if anyone in the group can prove causation. All recover based on the showing that someone should recover. However the nearly impossible burden of proving causation remains. Moreover, if the burden can somehow be satisfied by any one plaintiff or a subset of plaintiffs, the result imposes “crushing liability” on defendants that could negatively impact some efforts to find alternative energy sources.[54] In addition, this approach allows plaintiffs whose injury is probably genetic or due to background radiation to recover along with those who can trace their injury to the disputed source. But, the fact that one or more plaintiffs in a given population have been injured by exposure to a given source certainly does not mean that everyone in that population has been. Yet, everyone would ride along on the claims of those who can show a defendant proximately caused his/her injury.
2. The Proportionality Rule
• Alternatively, some courts have used the proportionality rule. This rule presumes causation when a plaintiff presents statistical evidence showing that it is likely that a defendant’s activities caused an injury to a proportion of the individuals in the ex *284 posed population.[55] This approach may, at first, also appear to resemble Pennsylvania’s “frequency, regularity and proximity” test. However, under a pure implementation of this proportionality rule, plaintiffs are not required to present individualized proof. For example, -if 100 plaintiffs alleged that defendant’s disposal of hazardous wastes caused their injury and the risk of developing such injury in the exposed population is 55%, then every plaintiff will recover 55%.[56] However, plaintiffs will likely. never obtain complete recovery under such a tort regime.[57] In addition, this rule still allows plaintiffs whose injuries or deaths were likely attributable primarily to background radiation or genetics (or a combination of the two) to recover.
3. ..The A We» Rule
The United States District Court for the District of.Utah presented another option in Allen v. United States, which involved a dispute arising from atmospheric testing. That court resorted to burden shifting. A rebuttable presumption of liability arises if a plaintiff can show a correlation between his or her injuries and the increased risk resulting from a defendant’s negligent release of radiation. The problem here is that correlation is not the same as- causation.[58] Yet, using this approach, Allen held that
[wjhere a defendant who negligently creates a radiological hazard which puts an identifiable population group at increased .risk, and a member .of that group at risk develops a biological condition which is consistent with having been caused by the hazard to which he has been negligently subjected, such consistency having been demonstrated by substantial, appropriate, persuasive and connecting factors, a fact finder may reasonably conclude that the hazard caused the condition absent persuasive proof to the contrary offered by the defendant.[59]
In undertaking this inquiry, the fact finder considers the following non-exhaustive list of factors:
(1) the probability that plaintiff was exposed to ionizing radiation due to nuclear fallout from atmospheric testing at the ... Test Site at rates in excess of natural background radiation; (2) that plaintiffs injury is of a type consistent with those known to be caused by exposure to radiation; and (3) that plaintiff resided in geographical proximity to the *285 ... Test Site.... Other factual connections may include but are not limited to such things as time and extent of exposure to fallout, radiation sensitivity factors such as age or special sensitivities of the afflicted organ or tissue, retroactive internal or external dose estimation by current researchers, a latency period consistent with a radiation etiology, or an observed statistical incidence of the alleged injury greater than the expected incidence in the same population.[60]
The problem here is that because this yule presents several factors that courts can consider, consistency may be elusive and courts addressing substantially identical circumstances may reach different results. Nevertheless, this approach appears to be the most promising and the most consistent with the realities of the risk created by an activity that can expose a population to radiation. It may be that the only realistic approach is to compensate an identified population for the increased risk occasioned by a given activity. I do not, however, suggest that such nagging questions as the amount of that compensation, identifying the population that is at increased risk, or countless other factors lend themselves to easy or equitable resolution.
None of these approaches have yet gained wide acceptance and, as should be evident from this discussion, none of these approaches is close to perfect. Rather, they are sorely needed attempts to adopt (or augment) the traditional rules requiring a direct and linear cause-in-fact relationship with no intervening causes, to the reality of exposure to ionizing radiation resulting from human activities.
III. CONCLUSION
For reasons I have explained, my concerns about some of the District Court’s rulings are not sufficient to cause me to conclude that the court erred in granting summary judgment against these Plaintiffs and dismissing the complaint. Problems with the Plaintiffs’ proof (and lack thereof) and the Herculean task of trying to produce enough evidence to get to a fact finder on the issue of causation are simply too formidable for these claims to survive.
As I have explained, this will almost always be the case until state supreme courts, state legislatures and/or Congress devise a way to more fairly address the very real and substantial dangers posed by activities that increase the risk of exposing communities to ionizing radiation. However, since that day is not yet here, I agree that Defendants were entitled to summary judgment. I can only hope that the dues that we pay for the comforts of living in the atomic age will one day not require us to forego remedies for the harmful effects of the nuclear byproducts of that modernization, which we are still trying to understand.

. Maj. Op. at 250-51.

. See In re TMI, 67 F.3d 1103, 1117 n.33 (3d Cir. 1995).

.See Maj. Op. at 252-53.

. JA4439-40 (emphasis added).

. JA4693.

. See Maj. Op. at 257, 259-61.

. 193 F.3d 613 (3d Cir. 1999).

. See id. at 632.

. 'See Maj. Op. at 263-64.

. See George L. Voelz, Plutonium and Health: How Great is the Risk?, Los Alamos Sci. 83 (2000), https://fas,org/sgp/othergov/ doe/lanl/pubs/00818013 .pdf; Katherine Harmon, Health Risk Fears Escalate as Japan Nuclear Plant’s Radioactive Release Remains Uncertain, Sci. Am. (Mar. 18, 2011), https:// www.scientificamerican.com/article/health-riskfukushima/ ("Plutonium is of graver concern because of its exceptionally long half-life (about 24,000 years) and its propensity to cause lung cancer if inhaled.”).

. Maj. Op. at 267.

. See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717 (3d Cir. 1994).

. See Mancia v. Dir., Office of Workers' Comp. Programs, U.S. Dep’t of Labor, 130 F.3d 579 (3d Cir. 1997).

. See Rost v. Ford Motor Co., _ Pa. _, 151 A.3d 1032 (2016).

. Maj. Op. at 253-54; see TMI II, 193 F.3d 613.

. Maj. Op. at 254 (citing TMI II, 193 F.3d at 639-40). Although we used the term "man-made” in TMI II, it is actually a misnomer that obscures some of the very important distinctions between environmental radiation naturally occurring and radiation from substances that are, in fact, manmade. The latter radiation is not actually “manmade.” It consists of natural elementary particles that are transformed by human activity. The resulting radiation is nevertheless the result of quantum mechanical processes. However, for the sake of convenience, we will also refer to this radiation as “manmade” as we did in TMI II.

. TMI II, 193 F.3d at 639 ("[A]n atom is ionized when an electron is ejected from its orbit and expelled from thé atom.”). It is actually a sweeping generalization to refer to all ionizing radiation as resulting from a single displaced electron. A very detailed description of the process of ionization (including the all important Columb Force) can be found at TMI II, 193 F.3d at 632-38.
However, the complex distinctions are not important for purposes of this discussion. Therefore, rather than attempt more precision by distinguishing between the different types of ionizing particles and ionizing energy as we did in TMI II, we will refer to all. ions as if they only consisted of .electrons without attempting to distinguish between alpha, beta or gamma radiation or between orbital electrons and electrons created through nuclear reactions. The important thing for purposes of this discussion is that "[wjhen a charged particle passes through matter, it excites and ionizes atoms in its path.” Id. at 635. This is what happens to human tissue that is exposed to radiation.

. Id. at 644-47.

. See Natural background radiation, Am. Cancer Soc'y, https://www.cancer.org/cancer/' cancer-causes/radiationexposure/x-rays-gamma-rays/natural-background-radiation. html (last revised Feb. 24, 2015) (explaining that radon is but one source of the background radiation that we are potentially exposed to on a daily basis and is listed only for purposes of illustration).

. .See TMI II, 193 F.3d at 640.

. Rost, 151 A.3d at 1039 (citations omitted).

. Id.

. Id.

. Id.

. William D. O'Connell, Causation's Nuclear Future: Applying Proportional Liability to the Price-Anderson Act, 64 Duke L.J. 333, 348 (2014) [hereinafter O'Connell] (citing James E. Turner, Atoms, Radiation, and Radiation Protection 421 (3d ed. 2007) [hereinafter Turner], available at http://nuclear.dababneh. com/Radiation-Undergrad2/Atoms,% 20Radia-tion,% 20and% 20Radiation% 20Protection. pdf.

. Id. at 350 (citing Turner at 468).

. TMI II, 193 F.3d at 643 (citations omitted).

. Id. at 643-44. For a detailed explanation of the two major sources of natural radiation and average doses, see id. at 644-48,

. For a detailed discussion of this, see id.

. U.S. Nuclear Regulatory Comm'n, Background radiation, https://www.nrc.gov/ reading-rm/basicref/glossary/background-radiation.html,

. See TMI II, 193 F.3d at 644-48.

. See id. at 637 n,36.

. Id. at 637 ("The absorbed energy per unit mass of material is termed the ‘absorbed dose.’ ”).

. World Nuclear Ass’n, Nuclear Radiation and Health Effects, htlp://www. world-nuclear, org/informationlibrary/safety-and-security/ radiation-and-health/nuclear-radiation-and-health-effects.aspx.

. See, e.g., Huber R. Warner, If You Wish to Live a Long Time in Good Health, Choose Your Parents Carefully, 62A J. of Gerontology: Biological Scis. 575 (2007), available at https:// www.ncbi.nlm.nih.gov/pubmed/17595411; see also Steve C. Gold, When Certainty Dissolves into Probability; A Legal Vision of Toxic Causation for the Post-Genomic Era, 70 Wash. & Lee L. Rev. 237, 259 (2013) [hereinafter Gold].

. Gold at 258-59.

. Taylor Meehan, Lessons from the Price-Anderson Nuclear Industry Indemnity Act for Future Clean Energy Compensatory Models, 18 Conn. Ins. L.J. 339, 346 (2012) [hereinafter Meehan]; see also Michael Flynn, A Debt Long Overdue, Bulletin of the Atomic Scientists 41-42 (2001) (The Energy Employees Occupational Illness Compensation Act acknowledged that "nuclear weapons workers were put at risk building the country’s arsenal.” Acknowledging the difficulties associated with establishing causation, and “[b]ecause the government failed to adequately track exposures _ at these sites, [the Act] assumes that workers' cancers are work related, thus relieving the workers of the near-impossible task of having to prove the connection." Further, the Act “establishes the possibility that other sites and illnesses may be added to the cohort at a later date.’’); see also David Rocchio, The Price-Anderson Act: Allocation of the Extraordinary Risk of Nuclear Generated Electricity: A Model Punitive Damage Provision, 14 B.C. Envtl. Aff. L. Rev. 521, 538-39 (1987) [hereinafter Rocchio] (citing Hearings Before the Joint Committee on Atomic Energy on Pro *281 posed Amendments to the Price-Anderson Act Relating to Waiver of Defenses, 89th Cong., 2d Sess. 105-07 (1966), available at https://www. Ioc.gov/resource/conghear08.00170174379/? sp= 10).

. Rocchio at 539.

. 42 U.S.C. § 2014(j).

. Id.

. Meehan at 347.

. Id.; see 42 U.S.C. § 2210(n)(l)(F)(iii) (The Act allows "any issue or defense based on any statute of limitations if suit is instituted within three years from the date on which the claimant first knew, or reasonably could have known, of his injury or damage and the cause thereof.”).

. Presidential Comm’n on Catastrophic Nuclear. Accidents, Report to the Congress from the Presidential Commission on Catastrophic Nuclear Accidents, Letter to the Senate (August 1990) [hereinafter Report], available at http://www.state.nv,us/nucwaste/news/rpccna/ pcrcna02.htm.

. Id. at ch. 4.IV.B.

. Id.

. This option is known as the “probability of causation” rule.

. Report at ch. 4,11.

. Id. at ch. 4.IV.B. (citation omitted).

. The following discussion of evolving law is not intended as an exhaustive survey. Rather, I mention it only to offer additional examples of the problem and some solutions that have been suggested.

. Shelly Brinker, Opening the Door to the Indeterminate Plaintiff: An Analysis of the Causation Barriers Facing Environmental Toxic Tort Plaintiffs, 46 UCLA L. Rev. 1289, 1303-04 (1999) [hereinafter Brinker]; see Sterling v. Velsicol Chemical Corp., 855 F.2d 1188, 1201 (6th Cir. 1988) (“Whereas numerous jurisdictions have rejected medical experts' conclusions based upon a 'probability,' a ‘likelihood,’ and an opinion that something is ‘more likely than not’ as insufficient medical proof, the Tennessee courts have adopted a far less stringent standard of proof and have required only that the plaintiffs prove a causal connection between their injuries and the defendant’s tortious conduct by a preponderance of the evidence. While, in accordance with Tennessee common law, plaintiffs' proof by a reasonable medical certainty requires them only to establish that their particular injuries more likely than not were caused by ingesting the contaminated water, their *283 proofs may be neither speculative nor conjectural.’’).

. In re Agent Orange Prod. Liab. Litig., 597 F.Supp. 740, 835-37 (E.D.N.Y. 1984), aff'd sub nom. In re Agent Orange Prod. Liab. Litig. MDL No. 381, 818 F.2d 145 (2d Cir. 1987) (quoting Jackson v. Johns-Manville Sales Corp., 727 F.2d 506, 516 (5th Cir. 1984), on reh’g, 750 F.2d 1314 (5th Cir. 1985)) (The rule provides an " 'all or nothing’ approach, whereby [assuming all other elements of the cause of action are proven], the plaintiff becomes entitled to full compensation for those ,.. damages that are proved to be ‘probable’ (a greater than 50 percent chance), but is not entitled to any compensation if the proof does not establish a greater than 50 percent chance.”),

. Id. at 835.

. See Maj. Op. at 266-68 (citing Rost, 151 A.3d 1032).

. Brinker at 1309-10.

. Id. at 1313.

. Sindell v. Abbott Labs., 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, 937 (1980); see Cottle v. Superior Court, 3 Cal.App.4th 1367, 5 Cal.Rptr.2d 882, 905 (1992) (Johnson, J., dissenting) (“Instead of choosing between the extremes of overcompensation and no compensation at all this solution allows plaintiffs to recover a percentage of their damages from those responsible for their exposure to the toxic. Under this formula defendants responsible for the toxic exposure are liable to all those who were exposed and later suffered injury — including those who may have suffered the injury even if they had never come near the toxic substance. But defendants are only liable for a percentage of plaintiffs’ damages equal to the degree this exposure increased plaintiffs’ risk of injuiy. For example, assume a chemical increases the risk of cancer by 15 percent among those exposed to the toxin. All exposed to this chemical who later came down with cancer would be entitled to recover 15 percent of their total damages from those responsible for the exposure.").

. Brinker at 1318 (citation omitted).

. For example, the height of males and females correlates to whether they play profes- . sional basketball.' However, playing professional basketball does not cause players to grow taller.

. Allen v. United States, 588 F.Supp. 247, 415 (D. Utah 1984), rev’d on other grounds, 816 F.2d 1417 (10th Cir. 1987).

. Id/, see also Restatement (Second) of Torts § 433 (1965) ("The following considerations are in themselves or in combination with one another important in determining whether the [defendant's] conduct is a substantial factor in bringing about harm to another: (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it; (b) whether the actor’s conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor- is not responsible; (c) lapse of time.”); see also O’Connell (proposing a species of proportionality tests that allows compensation based upon increased risk once that risk exceeds a certain threshold. The threshold is, of course, a policy matter and can be determined by legislatures after hearings on this issue,).