Filed 3/12/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GABRIEL MONTOYA, | |
| Plaintiff and Respondent, | G056752 |
| v. | (Super. Ct. No. 30-2013-00656947) |
| FORD MOTOR COMPANY, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment and order of the Superior Court of Orange County, Glenda Sanders, Judge.  Reversed and remanded with directions.

Horvitz & Levy, Lisa Perrochet, Peder K. Batalden and Allison W. Meredith; Sanders Roberts, Justin H. Sanders and Darth K. Vaughn for Defendant and Appellant.

Hackler Daghighian Martino & Novak and Sepehr Daghighian; Law Offices of Michael H. Rosenstein and Michael H. Rosenstein; Knight Law Group and Steve B. Mikhov; Greines, Martin, Stein and Richland, Cynthia E. Tobisman and Meehan Rasch for Plaintiff and Respondent.

## I. INTRODUCTION

We attempt here to limn the borders of a rule recently promulgated by the United States Supreme Court in *China Agritech, Inc. v. Resh* (2018) 548 U.S. ___ [138 S.Ct. 1800] (*China Agritech*). We conclude the proper application of the rule of that case dictates that multiple tolling periods cannot be "stacked" here to extend a statute of limitations. We publish because no other California court has addressed multiple tolling since *China Agritech*, and we feel publication will facilitate appellate discussion in case we have it wrong.

Gabriel Montoya bought a 2003 Ford Excursion in April of 2003 for $50,822.03. A jury found that as of November 30, 2005, he knew it was a lemon. The statute of limitations for breaches of the implied warranty of merchantability is four years. (*Mexia v. Rinker Boat Co., Inc.* (2009) 174 Cal.App.4th 1297, 1306.) Montoya didn't sue Ford for another seven-and-one-half years, waiting until June 2013. Yet he was able to obtain a judgment against Ford of almost $59,000 for breach of the implied warranty of merchantability. This was roughly an $8,000 return over what he had originally paid for the vehicle 10 years earlier.

This was possible because there were two periods during which the statute of limitations was tolled while separate national class actions were pending against Ford, both of which were applied to Montoya's case. The first class action spanned the period April 21, 2006 – when the complaint was filed – to November 6, 2006 (199 days) – when class action certification was denied. The second class action spanned the period January 8, 2010 – when the complaint was filed – to April 19, 2013 (1197 days) – when Montoya opted out of the class action in the face of an impending settlement that would have given him only a fraction of the money he would ultimately be awarded by suing individually. The trial court tolled the statute of limitations for both class actions, allowing Montoya almost four extra years to bring his suit.

2

The equitable tolling of an individual's claim against a defendant because of a class action is a common law expansion of the United States Supreme Court, construing rules of federal class actions in both *American Pipe and Construction Co. v. Utah* (1974) 414 U.S. 538 (*American Pipe*) and *Crown, Cork & Seal Co., Inc. v. Parker* (1983) 462 U.S. 345, 346-347 (*Crown Cork*).  The phrase "*American Pipe* tolling" appears in a handful of California cases and in literally hundreds of federal ones.  As we explain below, the doctrine was developed to strike a balance between the judiciary's need for economy and efficiency and the policy against stale claims that animates statutes of limitations.  It was *not* developed, as Justice Blackmun stressed in his concurring opinion in *American Pipe*, to "save members of the purported class who have slept on their rights."  (See *American Pipe, supra*, 414 U.S. at p. 561 (conc. opn. of Blackmun, J.).)

The question of whether the equitable tolling made possible in *American Pipe* should extend to a second class action is a question our federal compatriots have addressed at some length, and we find ourselves in agreement with their resolution of the issue.  Therefore, in this case we determine that to toll the statute of limitations during the period of a second class action contravenes the judicial economy and efficiency that *American Pipe* was trying to achieve.  To do so would take the law of class actions back full-circle to the pre-1966 class action procedure when putative class members (like Montoya) could wait and see what sort of outcome would be forthcoming in a class action and then decide to opt out and file their own individual suit.  Second class action tolling multiplies litigation, rather than consolidating and reducing it.  We therefore hold the second class action against Ford did not toll the four-year statute, and we reverse with directions to enter judgment in favor of defendant Ford.

3

## II.  BACKGROUND

On April 4, 2003, Montoya bought a new 2003 Ford Excursion equipped with a 6-liter diesel engine made by the Navistar Corporation.  The total "cash price" of the vehicle was $46,792.15, and when various fees and taxes were added, it amounted to $50,822.03.[1]

On April 21, 2006, about six months after Montoya knew or should have known his Ford Excursion was a lemon, a nationwide class action was filed against Ford in federal court in South Carolina (Class Action 1), alleging the 2003 through 2006 model Ford Excursions were defective in numerous ways including the turbocharging system.[2]  But on November 6, 2006, the federal district court denied class certification, reasoning the various problems alleged with the Excursion's Navistar engine were just too varied and too susceptible to individual differences in upkeep and maintenance to warrant class adjudication.[3]

On January 8, 2010, more than three years after the denial of class certification in Class Action 1, another nationwide class action suit was filed against Ford, this time in federal court in Illinois:  *Custom Underground, Inc., v. Ford Motor Company* (the Navistar action[4]).  The Navistar action was not decertified.  It proceeded as a class action and sometime in 2013 the parties reached a tentative settlement.

The hearing on that settlement was scheduled for the week of May 20 2013.  The tentative settlement envisioned legal fees to be paid the attorneys of as much as $12.8 million.  Class members, on the other hand, received only limited reimbursement

---

[1]    Because Montoya financed almost the entire price, the "total sale price" was $66,162.68.

[2]    Other alleged design defects included its fuel injectors, oil system, wiring harnesses, various sensors, exhaust recirculation valves and computers.

[3]    We grant Ford's request we take judicial notice of the federal district court's order denying class certification in *Cox House Moving Inc. on behalf of itself and all others similarly situated v. Ford Motor Company,* CA No. 7:06-1218-HMH (D. S.C. 2006).  This "Cox House" action is referred to in this opinion as "Class Action 1."

[4]    The briefing refers to Class Action 2 as the "Navistar action" after the company that made the ill-fated 6-liter diesel engines for the Excursion.  We have adopted their nomenclature.

of engine repair expenses for certain components – including the turbocharger – within, at most, 6 years or 135,000 miles.  Before the hearing on the settlement, class members were given the option of opting out of the class action.  The opt-out deadline was April 22, 2013.

Montoya opted out of the settlement three days before the deadline – on April 19.  He filed the original complaint in this action two months later, on June 14, 2013.  The case went to trial, and Montoya prevailed on his breach of implied warranty of merchantability claim.  The jury awarded him $58,880.37.

Ford moved for judgment notwithstanding the verdict (JNOV) on the ground that tolling for more than one class action is not allowed, citing a recent federal Supreme Court decision, *China Agritech, supra,* 138 S.Ct. 1800.  The trial court denied the JNOV motion, reasoning that *American Pipe* tolling is automatic, and that *China Agritech*, which addressed tolling for subsequent *class* actions, did nothing to change *automatic* tolling for subsequent *individual* actions.  Ford appealed from the ensuing judgment and order denying its JNOV motion.

### III.  DISCUSSION

The trial court's ruling was based on its assessment *American Pipe* tolling automatically extends to all class claims, all the time.  The minute order stated: "[Montoya] had the right to wait until the class claims were resolved one way or another before pursuing his own individual claim."

We think that was mistaken.  *Automatic* tolling does not even extend to a *first* class action (see *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1123-1124 (*Jolly*) [refusing to toll statute of limitations on individual suit during period of earlier class action]), much less a second class action.  And tolling the statute of limitations during a second class action – particularly one that, as here, reached class status and resulted in a settlement – seems inimical to judicial economy and efficiency.  We believe a review of

5

the benchmark Supreme Court decisions bearing on "*American Pipe* tolling" supports this conclusion.

In *American Pipe* the state of Utah filed its own civil class action based on price fixing in the steel and concrete pipe industries. (*American Pipe, supra*, 414 U.S. at pp. 540-541.) Utah's class action was subsequently not certified as a class action; the trial judge decided the number of members in the class was just not big enough to justify proceeding as a class action. (*Id.* at p. 543.) But then more than 60 local government entities within Utah filed motions to intervene in Utah's now-no-longer-a-class-action action. The district court denied the motions to intervene on the ground the statute of limitations had now run. The case reached the Supreme Court to determine whether the motions to intervene should have been denied. Certiorari was granted "to consider a seemingly important question *affecting the administration of justice* in the federal courts." (*Id.* at p. 545, italics added.)

The court began its analysis by reviewing the history of Federal Rule of Civil Procedure 23,[5] governing class actions. The court's main point was that rule 23 had been amended in 1966 to curb the existing "abuse" of one-way intervention: "A recurrent source of abuse under the former Rule lay in the potential that members of the claimed class could in some situations await developments in the trial or even final judgment on the merits in order to determine whether participation would be favorable to their interests." (*American Pipe, supra*, 414 U.S. at p. 547.) Rule 23 had been reformed to prod trial courts to determine the suitability of a suit proceeding as a class action "'as soon as practicable.'" (*Id.* at p. 547, quoting rule 23(c)(1).)

The idea was that the potential for gamesmanship had been minimized. A class member would have to decide fairly early in the litigation whether to retain class membership and be bound by the judgment or opt out. (*Id.* at p. 549.) "Finally, the

---

5        All further reference to any rules are to the Federal Rules of Civil Procedure.

6

present Rule provides that in Rule 23(b)(3) actions the judgment shall include all those found to be members of the class who have received notice and who have not requested exclusion. Rule 23(c)(3). [Fn. Omitted.] Thus potential class members retain the option to participate in or withdraw from the class action . . . 'as soon as practicable after the commencement' of the action when the suit is allowed to continue as a class action and they are sent notice of their inclusion within the confines of the class. *Thereafter they are either nonparties to the suit and eligible to participate in a recovery or to be bound by a judgment, or else they are full members who must abide by the final judgment, whether favorable or adverse*." (*American Pipe, supra*, 414 U.S. at pp. 548-549, italics added.)

The court then turned its attention to tolling. It began by stating a rule that the statute of limitations should be tolled for all purported members of the class who make "timely motions to intervene after the court has found the suit inappropriate for class action status." (*American Pipe, supra*, 414 U.S. at p. 553.) This was done to spare federal district courts the burden of needless duplicative preemptive motions to intervene by putative class members just in case class certification was denied. The court's concern was that, "Potential class members would be induced to file protective motions to intervene or to join *in the event that a class was later found unsuitable*. In cases such as this one, where the determination to disallow the class action was made upon considerations that may vary with such subtle factors as experience with prior similar litigation or the current status of a court's docket, *a rule requiring successful anticipation of the determination of the viability of the class would breed needless duplication of motions*." (*Id.* at pp. 553-554, italics added.) On the other hand, "A contrary rule allowing participation only by those potential members of the class who had earlier filed motions to intervene in the suit would deprive Rule 23 class actions of the efficiency and economy of litigation which is a principal purpose of the procedure." (*Id.* at p. 553.)

So, as a safeguard, the *American Pipe* court confronted the potential unfairness to defendants of such a tolling rule. It concluded tolling did not interfere with

7

"the functional operation of a statute of limitations" because the class action had already given defendants notice, allowing them the opportunity to marshall their evidence to defend the underlying claim. (*American Pipe, supra*, 414 U.S. at pp. 554-555.) "The policies of ensuring essential fairness to defendants and of barring a plaintiff who 'has slept on his rights,' [citation], are satisfied when, as here, a named plaintiff who is found to be representative of a class commences a suit and thereby notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." (*Ibid*.) Applying a new tolling rule based on Utah's class suit, the high court held the motions to intervene were timely and should have been granted. (*Id.* at pp. 544, 561.)

*American Pipe* thus stood only for a rule allowing tolling of the statute of limitations for motions to *intervene* in actions originally framed as class actions, but then denied class action status. The possibility of tolling for *individual* claims based on class actions that never attained class action status had to wait another nine years for federal high court examination in *Crown Cork, supra,* 462 U.S. 345.

The *Crown Cork* court framed the question of whether tolling would extend to individual actions in a way that suggested tolling would only apply where there was a *first* class action. "The question that confronts us in this case is whether the filing of a class action tolls the applicable statute of limitations, and thus permits all members of the putative class to file individual actions in the event that class certification is denied, provided, of course, that those actions are *instituted within the time that remains* on the limitations period." (*Crown Cork, supra,* 462 U.S. at p. 346, italics added.)

*Crown Cork* pointed to the need for *notice* to class members so they could decide to opt out if they wanted to.[6] The whole point of getting notice the first time was to give class members the right to opt out, and that right to bring an individual claim

---

[6] Citing *Eisen v. Carlisle & Jacquelin* (1974) 417 U.S. 156 (*Eisen*) for the rule. (*Crown Cork, supra*, 462 U.S. at p. 351.)

8

would be meaningless if the statute of limitations had been allowed to run during the pendency of the class action.[7] So the court held the statute was tolled for those class members.

California's Supreme Court first considered *American Pipe* tolling in *Jolly*, *supra*, 44 Cal.3d 1103. In *Jolly* an individual sued various pharmaceutical companies for injuries derived from her *in utero* exposure to DES (short for diethylstilbestrol, a synthetic estrogen used to prevent miscarriages in the 1950's). Sometime in 1978, Jolly had reason to suspect her injuries were the result of DES, but she did not sue until 1981. Given the (then) one-year statute of limitations on a personal injury action, her suit was time-barred (*Jolly, supra*, 44 Cal.3d at p. 1114) *unless* the statute of limitations was tolled during the pendency of a prior class action also based on in utero DES exposure, *Sindell v. Abbott Laboratories* (1980) 26 Cal.3d 588 (*Sindell*).

Was her suit tolled? California's high court unanimously said no. The *Jolly* court disallowed *American Pipe* tolling because there were too many "differences in issues of fact and law" between the *Sindell* class action and Ms. Jolly's individual case. (*Jolly, supra*, 44 Cal.3d at pp. 1123-1124.)

In 2007, our state high court had occasion, in *Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069 (*Fireside Bank*), to deal directly with the one-way intervention theme of *American Pipe*. *Fireside Bank* was a case in which the trial court deviated from the *general* rule of adjudicating class status *prior* to adjudicating the merits of the case. The trial court there granted a motion for judgment on the pleading (in favor of the plaintiff class) at the same time it granted class certification. (*Fireside Bank,*

---

7    "If *American Pipe's* tolling rule applies only to intervenors, this reference to *American Pipe* is misplaced and makes no sense. *Eisen's* notice requirement was intended to inform the class member that he could 'preserve his opportunity to press his claim *separately*' by opting out of the class. [*Eisen, supra*] 417 U.S., at 176 (emphasis added). But a class member would be unable to 'press his claim separately' if the limitations period had expired while the class action was pending." (*Crown Cork, supra*, 462 U.S. at p. 351.)

9

*supra*, 40 Cal.4th at p. 1077.) The defendant then sought writ relief and the California Supreme Court took the case.

First, the *Fireside Bank* court emphasized that the proper "sequence" was for the court first to determine whether a case should proceed as a class action and only then adjudicate the merits that would "promote judicial efficiency." (*Fireside Bank, supra*, 40 Cal.4th at p. 1074, italics added.) Efficiency is achieved that way because proper sequencing postpones "merits ruling until such time *as all parties may be bound*[.]" (*Ibid.*, italics added.) Proper sequencing also promotes "fairness, by ensuring that parties bear equally the benefits and burdens of favorable and unfavorable merits rulings." (*Ibid.*) And, while the court took the opportunity to eschew rigidity – *Fireside Bank* acknowledged that there are some circumstances in which "postmerits certification" might be permitted (see *id.* at p. 1082) – it laid down rules for class action management. The sum of those rules was that courts "should not resolve the merits in a putative class action case before class certification and notice issues absent a compelling justification for doing so." (*Id.* at p. 1083.) The defendant's quest for writ relief was then returned for further proceedings consistent with the rules the court had just enunciated. (*Id.* at p. 1093.)

All of which brings us to the most recent federal high court encounter with the class action tolling problem: the 2018 case Ford cited in its JNOV motion, *China Agritech, supra,* 138 S.Ct. 1800. In *China Agritech* the Supreme Court held *American Pipe* tolling does not apply to toll the statute of limitations during the period of a *second class action* for purposes of whether yet a *third* class action could be timely.

The *China Agritech* case was one in which a class action was filed against a corporation for fraud and misleading business practices, alleging violation of the Securities Exchange Act of 1934. The applicable statute of limitations was two years. But that first class action was denied class certification, and notice of that denial was given the class. Within the two-year period, a new class action was filed, but that too was

10

denied class certification.  (*China Agritech, supra*, 138 S.Ct. at pp. 1804-1805.)  Then a *third* class action was filed.  The third action was dismissed by the trial court as untimely because, by then, the statute of limitations had run.  (*Id.* at p. 1805.)  The Ninth Circuit, however, reversed the trial court, reasoning that *American Pipe* tolling should apply to both prior class actions.  (*Ibid.*)

The United States Supreme Court thought otherwise, in language just as easily applied to successor individual actions such as ours as to successor class actions. "We hold that *American Pipe* does not permit a plaintiff who waits out the statute of limitations to piggyback on an earlier, timely filed class action.  The 'efficiency and economy of litigation' that support tolling of individual claims, *American Pipe*, 414 U.S., at 553, 94 S.Ct. 756, do not support maintenance of untimely successive class actions; any additional *class* filings should be made early on, soon after the commencement of the first action seeking class certification." (*China Agritech, supra*, 138 S.Ct. at p. 1806.)

The specter of limitless tolling clearly concerned the court.  In several passages it signaled its distaste for the idea that more than one tolling period could extend the statute of limitations.  First the court majority spoke in its own voice.  "Respondents' proposed reading would allow the statute of limitations to be extended time and again; as each class is denied certification, a new named plaintiff could file a class complaint that resuscitates the litigation."  (*China Agritech, supra*, 138 S.Ct at p. 1808.)

Then Justice Ginsburg's opinion cited to a fellow justice's concurring and dissenting opinion from the Third Circuit.  "[T]olling for successive class actions could allow 'lawyers seeking to represent a plaintiff class [to] extend the statute of limitations almost indefinitely until they find a district court judge who is willing to certify the class.'" (*China Agritech, supra*, 138 S.Ct. at p.1808, citing *Yang v. Odom* (3rd Cir. 2004) 392 F.3d 97, 113 (conc. and dis. opn. of Alito, J.).)  Justice Ginsburg's opinion also cited to an 11th Circuit decision making the same point:  "[T]olling for successive class actions allows plaintiffs 'limitless bites at the apple.'"  (*China Agritech, supra*, 138 S.Ct. at

11

p.1808, citing *Ewing Industries Corp. v. Bob Wines Nursery, Inc.* (11th Cir. 2015) 795 F.3d 1324, 1326.)

Finally, the court reiterated its concern in language that again seems to us to apply with the same force to individual actions as to successive class actions: "Most statutory schemes provide for a single limitation period without any outer limit to safeguard against serial relitigation. Endless tolling of a statute of limitations is not a result envisioned by *American Pipe*." (*China Agritech, supra*, 138 S.Ct. at p. 1809.)

From our canvass of the interaction between class actions and statutes of limitation as explained by both our federal and state Supreme Courts, we think the idea of tolling an individual action during the period of a second class action to be untenable. Tolling during a second class action – particularly *this* second class action – defeats the objectives of judicial economy and efficiency that were the foundations of *American Pipe*. It overlooks the problem of endless tolling that informed and suffused the *China Agritech* opinion.

Judicial economy and efficiency are defeated because second class action tolling reintroduces the problem of one-way intervention the 1966 amendments to Federal Rule 23 were intended to cure. One-way tolling was an "abuse" of the system because it gave putative class members an incentive to wait and see what the trial court would do (or at least *signal* what it might do) with the ostensible class action before it. If the merits looked bad, class members could bail on the class action and pursue their own actions elsewhere.

And that is precisely what happened here. The *Crown Cork* court's anticipation was that a putative class member might receive notice a class action has not reached class status so the member would have the opportunity to opt out and bring an individual action. But Montoya waited more than four years after Class Action 1 failed to be certified to bring his individual action. Only when Class Action 2 ended with a proposed settlement that would have afforded Montoya – had he stayed in Class Action 2

12

– only a fraction of the recovery he would later obtain suing individually, did he finally sue.

So instead of two class action suits with the second one disposing of all remaining claims against Ford for the ill-fated Excursion 2003 to 2006 models, tolling for the Class Action 2 period gave Montoya a second bite of the apple in terms of being able to wait and see what happened on the merits in that class action. The result was at least one additional suit (Montoya's) for the judicial system to administer, with the potential for a further multiplicity of individual suits brought by other putative class members who might find the proposed settlement in Class Action 2 not to their liking.[8] Tolling defeated the efficient class action feature that seeks to bind all members of the class into one judgment. (See *Fireside Bank, supra*, 40 Cal.4th at p. 1074.)

Montoya's response to the issue of successive class action tolling – sometimes called "stacking" – is twofold. First, he relies on two cases which, like *China Agritech*, involved a successor *class* action. (See *Falk v. Children's Hospital Los Angeles* (2015) 237 Cal.App.4th 1454 (*Falk*) [allowing second class action tolling for later class action] and *Fierro v. Landry's Restaurant Inc.* (*Fierro*) (2019) 32 Cal.App.5th 276 [refusing to follow *Falk* and not allowing second class action tolling for later class action].) But the only take-away we can derive from the *Falk-Fierro* duet is that after *China Agritech* the idea of tolling during a second class action is unviable and that *Falk* would have reached the same conclusion had it the benefit of *China Agritech* in its analysis. (See *Fierro, supra*, 32 Cal.App.5th at p. 297 [to the same point].)

On the "logic" of the issue, Montoya's argument is essentially tautological: He points out that if stacking is not allowed a putative class member would not be able to "benefit" from a second class action. (See Resp. br. at p. 72.) This argument assumes as

---

8    It is a reasonable inference that when Ford agreed to a settlement *in 2013* that gave class members an opt-out option, its lawyers were assuming the statute of limitations would likely have already run on claims based on its 2006 models. How much more so its 2003 models?

its premise that a putative class member *ought* to be able to benefit from a second class action. But the federal courts have been clear that they do not regard the exhumation of one-way intervention after they tried to bury it in the sixties as a benefit, and we are inclined to agree with them.

It is enough for our purposes here to conclude Class Action 2 did not toll Montoya's claim. The four-year statute of limitations therefore expired no later than 2010. He sued in 2013. His claim for breach of the implied warranty of merchantability was therefore untimely presented.[9]

---

[9] We thus have no need to address Ford's subsidiary arguments, which include: (1) whether Class Action 1 was worthy of tolling; (2) whether *American Pipe* tolling can be applied for out-of-state class actions; and (3) whether the statute of limitations on a claim for breach of implied warranty begins to run with the consumer's purchase of the good, as distinct from the discovery of its unmerchantability. Concomitantly, since we do not address the issue of cross-jurisdictional tolling, we deny as irrelevant Montoya's request for judicial notice of certain briefing in *San Francisco Unified School Dist. v. W.R. Grace & Co.* (1995) 37 Cal.App.4th 1318 germane to that issue.

## IV. DISPOSITION

The judgment is reversed and remanded with directions to enter a new judgment in favor of defendant Ford. The parties shall bear their own costs.

BEDSWORTH, ACTING P. J.

WE CONCUR:

IKOLA, J.

DUNNING, J.*

*Retired judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15